FILED
2013 Feb-12 AM 11:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

1   gentlemen of the jury just a brief summary of how

2   Pepsi was trained?

3   A.    Yes.   They take them as a puppy, and the way

4   they start to train these dogs is they -- first

5   off, they look for a dog that has a very strong

6   drive to play with toys and to hunt and search for

7   things.   And when they find that type of dog, they

8   will take a piece of PVC pipe and they drill holes

9   in the PVC pipe and they'll take the different

10  narcotics and put them inside that pipe and then

11  cap off the ends of these pipes.

12        And then they hide the pipe.   And they have

13  the dog search until she finds this PVC pipe.   And

14  so every time she starts to find this pipe she

15  starts to associate the odor of those narcotics

16  with the pipe, which is also her toy.   When we play

17  with the toy now, it's still a piece of PVC pipe,

18  alluminum pipe, copper pipe, stuff of that nature.

19  Stuff that you can hide drugs inside and hide it

20  for them and them find, but not be able to get to

21  the actual drugs.

22        But when they'll training them they'll put

23  all four of the different types of drugs down in

24  these pipes, and they'll throw it out in some tall

25  grass.   And have the dog go search for it until she

1 finds it.  They hide them in cars and buildings.
2 And anywhere you can put narcotics they'll hide
3 these toys that are stuffed with the narcotics, and
4 then every time the dog finds these toys they start
5 to associate over time the odor of the narcotics
6 with their toy.
7     So after she's trained, now, when we're
8 searching a car or a house, she is actually looking
9 for her toy and not looking for drugs.  But when
10 she smells the drugs she knows that that's the odor
11 that goes along with her toy, and that's when
12 she'll indicate.
13 Q.    Okay.  So this is a game to her?
14 A.    Yes.
15 Q.    Okay.  And this is kind of a hide and seek
16 thing, she gets to play?
17 A.    Right.
18 Q.    She gets to play if in fact something is
19 found?
20 A.    Right.  Any time we find something, then
21 she's rewarded with a toy.  And we spend ten
22 minutes off to the side in the grass, or wherever
23 we're at, playing with the toy while all the other
24 deputies get to go and actually work.
25 Q.    Okay.  Okay.

1        On the 24th of March, 2008 did you have
2   Pepsi with you when you were present at the patrol
3   stop of Durrell Bester?
4   A.    Yes, sir.
5   Q.    All right.  And at that time, was -- did
6   Pepsi stay in the car with you or did she get out?
7   A.    She was in the car initially.
8   Q.    Okay.
9   A.    And Deputy Daniels had asked for consent to
10  search the vehicle, I was present when he asked.
11  And the driver of the vehicle declined to give us
12  consent.
13        So at that point, I got Pepsi out of the
14  car.
15  Q.    Okay.  And what was the purpose in getting
16  Pepsi out of the car at that point?
17  A.    To run a free air sniff of the vehicle to see
18  if there was an odor of any narcotics present.
19  Q.    Okay.  A "free air sniff", I'm sure that
20  sounds -- that is exactly what it sounds like.
21  But what is a "free air sniff"?
22  A.    A free air sniff is where the courts have
23  ruled that any air coming out of the cracks,
24  crevices or seams of a vehicle, out of opened
25  windows and stuff like that, is free to be searched

1  with a K-9.  Because it doesn't belong to the car,

2  as long as it's coming out of the vehicle on it's

3  on.

4  Q.    Okay.  Now, when y'all are either playing --

5  excuse me.  When you are either playing with Pepsi

6  or when she's working, does she have any kind of

7  -- does she indicate in any manner, if she has in

8  fact found something that smells like one of her

9  toys?

10 A.    Yes, sir.  She's trained to indicate

11 passively.

12 Q.    Okay.  When you say "passively", what do you

13 mean?

14 A.    When she smells the odor of narcotics, she

15 will either sit down, stare at, or lay down and

16 stare at the location where she smells the odor

17 coming from.

18 Q.    Okay.  And you say she's trained to indicate

19 passively?

20 A.    Yes, sir.

21 Q.    Are there other ways of doing this?

22 A.    Yes.  They also train dogs to indicate

23 aggressively.  And an aggressive indication is

24 where the dog will start to paw or scratch at the

25 location, or bite at the location where they smell

```
 1   the odor.
 2   Q.    Okay.  But Pepsi is trained to indicate
 3   passively?
 4   A.    Yes, sir.
 5   Q.    All right.  You said you conducted this free
 6   air sniff?
 7   A.    Yes, sir --
 8   Q.    With Pepsi?
 9   A.    Yes, sir.
10   Q.    All right.  Tell us how you -- where you
11   conducted this sniff.
12   A.    Well, we were in the parking lot of a
13   restaurant and --
14   Q.    Is that where the truck had been pulled
15   over?
16   A.    Yes, sir.
17   Q.    Okay.
18   A.    They stopped behind an Arby's restaurant.
19   Q.    Okay.
20   A.    We're in this parking lot, and initially I'll
21   take her out of the car and have her lay down in
22   front of the vehicle.  And then I'll walk around
23   and show her the area that I want her to check.
24   And then we will go around the outside of the
25   vehicle checking the different seams and crevices.
```

1  The seams where the doors open, the seams -- the
2  cracks around the hood, the tires, gas tanks.
3       And if the windows are open, I'll have her
4  stick her head in the open window or smell right
5  there at the open window.  The beds of the pickup
6  truck, have her, come up on the side of the pickup
7  truck and she can stick her nose over and smell
8  along the edges of it.
9  Q.    All right.  Now, Deputy, when you've got
10  Pepsi, and you show her the areas you want her to
11  sniff, do you tell her where to indicate, do you
12  provide any kind of signal to her, I want you to
13  hit right here, or anything that you've trained
14  her to do that way?
15  A.    No, sir.
16  Q.    All right.  What is her purpose out on the
17  scene?
18  A.    Her purpose is to let us know if there is
19  anything -- any type of illegal narcotics in that
20  vehicle.
21       And what I will do with her, during those
22  searches, she will follow my hand, as far as I show
23  her like up on the hood, and then I'll move my hand
24  down to the bottom so she can check the door, and
25  just up and down.

1          But when she indicates, she sits and
2     indicates on her own.  It's not due to hand
3     movement or anything like that.
4     Q.    Okay.  And did you in fact ask -- or did you
5     instruct Pepsi to sniff this vehicle?
6     A.    Yes, sir.
7     Q.    All right.  And did she in fact passively
8     indicate anywhere?
9     A.    Yes, sir.  On the rear bed, cargo area of the
10    pickup truck.
11    Q.    All right.  Did she indicate anywhere else?
12    That you recall?
13    A.    Not that I recall.
14    Q.    All right.  And in the rear-bed, cargo area,
15    did she indicate on any -- anything in particular?
16    A.    Yes.  Once she had indicated on the outer
17    edge of the vehicle.  I put her up into the
18    vehicle, into the bed area, and she indicated on a
19    suit case that was in the back of that vehicle.
20    Q.    Okay.  And was that -- Based on her
21    indication, to your knowledge, was this suit case
22    searched?
23    A.    Yes, sir.
24    Q.    All right.  And what was found inside of it?
25    A.    Let me refer to my report on this.

```
 1                   (Witness reviewing documents.)
 2   A.     I searched the bag -- (reviewing documents).
 3   Q.     "In the black bag in the bed of the truck I
 4   found pieces of torn off Brillo pad, syringes, an
 5   ash tray, a pill splitter and a push rod that was
 6   burnt on the end for a crack pipe."
 7          All right.
 8          You said you found these items in a black
 9   bag, black suit case of some kind?
10   A.     Yes, sir.
11   Q.     Okay.  Were they contained in anything?  Do
12   you remember?
13   A.     Yes, sir.  They were found in a black plastic
14   box.
15   Q.     All right.
16   A.     That was inside of the suitcase.
17                        (Whereupon, the Prosecutor is
18                        showing defense counsel
19                        documents.)
20             THE COURT:  All right, Mike, hold on a
21          second there.
22             MR. ANDERTON:  Okay.
23             THE COURT:  Ladies and gentlemen, would
24          you go into the jury room.  Y'all are going
25          to have about ten minutes.  Okay.
```

```
 1                         (Whereupon, a break was had.)
 2                         (Whereupon, the Prosecutor and
 3                         defense counsel open State's
 4                         Exhibit Numbers 11 through 14
 5                         outside of the jury's presence.)
 6                         (Whereupon, the jury returns to
 7                         the courtroom where the following
 8                         is heard in open court with the
 9                         Defendant and all counsel
10                         present.)
11              THE COURT:  All right.  Go ahead.
12   Q.    Deputy Eaton, I'm going to show you what's
13   been marked State's Exhibit No. 11.  And ask you
14   to look at the package and see if you recognize
15   that package, please.
16   A.    Yes, sir.
17   Q.    What is this on the package, please?
18   A.    This is where I secured the black box that I
19   found in the suitcase that had drug paraphernalia
20   inside of it.
21   Q.    And who placed the black box in that
22   particular package?
23   A.    I did.
24   Q.    And did you mark that package with anything,
25   how can you tell that that's the same package?
```

1  A.    Yes, sir.  My name, my hand handwriting's on
2  it, and case number that goes along with this case
3  is on here.
4  Q.    All right.  Prior to placing -- Well, take a
5  look at the contents of State's Exhibit 11,
6  please.
7                    (Witness complies.)
8  Q.    All right.  Do you recognize the contents of
9  the black box that's in the envelope marked
10 State's Exhibit 11?
11 A.    Yes, sir.
12 Q.    All right.  And what is -- what are the
13 contents, please?
14 A.    You have an ash try, a pill splitter, three
15 syringes, small pieces of torn off Brillo pad, a
16 burnt push road, typical of use in a crack pipe.
17 There's some change, a lighter and a cell phone
18 also in here.
19 Q.    All right.  And you've been working for the
20 sheriff's office for 14 years; is that right?
21 A.    Yes, sir.
22 Q.    Have you had occasion to see those items in
23 the presences of -- or have you had a chance to
24 see those items in other situations?
25 A.    Yes, sir.

1  Q.    All right.  Are those items, or those items

2  in combination with each other, commonly used for

3  the injection of drugs?

4  A.    Yes, sir.

5  Q.    All right.  Once you've found these

6  particular items, what did you do with them,

7  please?

8  A.    I secured them into my vehicle.

9  Q.    All right.  And then what?

10  A.    And then, kept them with me until going back

11  to the office to put them in the envelope, and at

12  that point I put them over in the property room

13  over at our headquarters building.

14  Q.    All right.  The contents of the black box,

15  and the black box, were those items in your care,

16  custody and control the entire time, from the time

17  you retrieved them from a piece of luggage, to the

18  time that you placed them into the envelope or

19  State's Exhibit 11?

20  A.    Yes, sir.

21  Q.    All right.  And did you make any additions

22  or deletions to the black box or its contents,

23  once you collected it, and until the time you

24  placed it into the envelope marked State's Exhibit

25  11?

1  A.     No, sir.

2  Q.     All right.  Is it in the same --

3  substantially the same condition today as it was

4  when you first collected it?

5  A.     Yes, sir.

6  Q.     Now, once you placed that into the envelope,

7  what did you do with the envelope that had that in

8  it?

9  A.     I secured it in my evidence locker over

10 night.

11 Q.     Okay.

12 A.     And then took it and placed it in our

13 property room.

14 Q.     All right.  You sealed that envelope up; is

15 that right?

16 A.     Yes, sir.

17 Q.     How did you seal it up, please?

18 A.     We used red evidence tape.  And we seal all

19 the seams of the envelope.  Make sure all the seams

20 are completely covered.  And then I write my

21 initials over the tape, going over the part of the

22 envelope and the tape.  That way if the tape is

23 removed then my initials will be torn and they'll

24 know it's been opened.

25 Q.     All right.  Prior to coming to court today,

1    was that item in a sealed condition?

2    A.    Yes, sir.

3    Q.    All right.  And during the break for

4    purposes of all of us to see, were those items --

5    was that item opened?

6    A.    Yes, sir.

7    Q.    In the presence of defense counsel,

8    Defendant, yourself and the court reporter; is

9    that right?

10   A.    Yes, sir.

11   Q.    All right.  Now, but when you brought it

12   from the property room to court today, was it in a

13   sealed condition?

14   A.    Yes, sir.

15   Q.    All right.  And was it in your care, custody

16   and control the entire time from the time you

17   brought it from the property room over here to

18   court?

19   A.    Yes, sir.

20   Q.    Make any additions or deletions to it?

21   A.    No, sir.

22   Q.    In the same, or substantially the same,

23   condition now as it was when you first collected

24   back from the property room?

25   A.    Yes, sir.

1   Q.    All right.  With the exception of the fact

2   that it had been opened and it now how as exhibit

3   sticker on it?

4   A.    Yes, sir.

5   Q.    All right.

6          MR. ANDERTON:  The State would move to

7          introduce State's Exhibit 11 -- Excuse me

8          12, I'm sorry.

9          Is it 11?

10         THE WITNESS:  11.

11         MR. ANDERTON:  I'm sorry, Judge.

12         THE COURT:  11 is in.

13         MR. BENSON:  No objection, Your Honor.

14            (Whereupon, State's Exhibit Number

15            11 was received into evidence.)

16   Q.    Once that item, the black box and the drug

17   paraphernalia was found, you said that was found

18   in a piece of luggage in the back of the truck?

19   A.    Yes, sir.

20   Q.    All right.  Do you know whose luggage that

21   was?

22   A.    Yes, sir.  It was luggage that was seen by

23   deputies at the house --

24         MR. BENSON:  Objection, Your Honor.

25        The officer is testifying about what was

```
 1              seen by another officer.
 2                   THE COURT:  Sustained.
 3   Q.    Based on your investigation, have you come
 4   to find out whose luggage that was?
 5   A.    Yes, sir.
 6         I looked at the luggage, there were male and
 7   female clothes in it.  I asked the Defendant about
 8   the female clothes in there, and he said they
 9   belonged to his girlfriend.
10   Q.    All right.  What about the male clothes --
11                   THE COURT:  Excuse me, hold on one
12           second.
13                       (Off the record.)
14                   THE COURT:  Go ahead.
15   Q.    All right.  Do you see any tags on that
16   language?
17   A.    Not that I recall.
18   Q.    Okay.  Did you determine who owned that
19   particular luggage?
20   A.    Yes, sir.
21   Q.    Who?
22   A.    The Defendant.  I asked him about the
23   clothing and stuff that was in there, because there
24   was male and female clothing, and he said he had
25   left in a hurry, and just grabbed whatever he could
```

1  and threw it in the bag.

2  Q.    Okay.  At that time, was Mr. Bester

3  arrested?

4  A.    Yes, sir.

5  Q.    All right.  What was he arrested for?

6  A.    He was placed under arrest for unlawful

7  possession of drug paraphernalia at that time.

8  Q.    All right.

9        You indicated, earlier, that once he was

10  taken out of the truck, he was placed into the

11  back of Deputy Daniels' car; is that right?

12  A.    Yes, sir.

13  Q.    All right.  And did you to accompany Deputy

14  Daniels in taking Mr. Bester anywhere?

15  A.    No, sir.

16  Q.    Did you take Mr. Bester anywhere?

17  A.    No, sir.

18  Q.    Okay.  All right.  How long were y'all out

19  on the scene where the truck was stopped?

20  A.    I would say approximately 45 minutes.

21  Q.    Okay.  How much luggage was in the back of

22  that truck?

23  A.    There were numerous bags in the back-end.

24  Q.    Okay.  Bags, how about the luggage?  Was

25  there a lot of luggage back there?

1   A.      Yes, sir.   There were numerous, different

2   pieces of luggage in the back of the car.

3   Q.      All right.   Were did you -- how long were

4   out there on the scene?

5   A.      I would say 45 minutes.

6   Q.      Okay.   Once you left there, where did you

7   go?

8   A.      When I left there, I headed back to the

9   Center Point area, to the original residence, where

10  we were first conducting surveillance, to do the

11  search warrant.

12  Q.      Okay.   Did you at any point go over to

13  location of Mr. Bester's momma's house?

14  A.      No, sir, I did not.

15  Q.      Okay.   Did you in fact execute the search

16  warrant over at --

17          THE COURT:   Wait.   Are you saying house

18      and apartment interchangeably --

19          MR. ANDERTON:   Yes, Judge, and I

20      apologize.

21          THE COURT:   Don't confuse them.

22          MR. ANDERTON:   Yes, sir.   I'm sorry,

23      Judge.

24  Q.      You had a search warrant for Mr. Bester's

25  residence?

1   A.      Yes, sir.

2   Q.      Is that correct?

3   A.      Yes, sir.

4   Q.      What type residence was Mr. Bester's

5   residence?

6   A.      It was a house.

7   Q.      Okay.  His was a house?

8   A.      Yes, sir.

9   Q.      All right.  And apparently Mr. Bester went

10  into his mother's residence as well?

11  A.      Yes, sir.

12  Q.      At some point during that day, right?

13  A.      Yes, sir.

14  Q.      Okay.  And that's an apartment; is that

15  correct?

16  A.      Yes, sir.

17  Q.      Okay.  All right.

18          Did you in fact serve the search warrant on

19  Mr. Bester's residence, to the house?

20  A.      Yes, sir.

21  Q.      All right.  And during the course of that

22  search warrant, what if anything was found?

23  A.      There were --

24              THE COURT:  Is there an address?  Is

25          that the --

```
1              MR. ANDERTON:  Yes, sir.

2              (Witness reviewing documents.)

3              THE WITNESS:  1368 5th Place Northwest,

4         I believe is the address.

5    Q.    All right.  And was that Mr. Bester's

6    residence?

7    A.    Yes, sir.

8    Q.    All right.  When you got there, what if

9    anything did you find?

10   A.    We found a few small bags that had what

11   appeared to be cocaine residue inside the

12   residence.  There was a female and some children

13   there.  And we found a set of digital scales in the

14   kitchen cabinet.

15   Q.    Okay.  Were those items collected?

16   A.    Yes.

17   Q.    Okay.  Are those items here today?

18              (Witness reviewing documents.)

19   A.    I don't believe so.

20   Q.    Okay.  But you never went back to where Ms.

21   Bester's apartment was?

22   A.    No, sir.

23   Q.    Okay.

24              (Brief pause.)

25              MR. ANDERTON:  All right.  That's all
```

1      I've got for Deputy Eaton.

2            THE COURT:  All right.  Cross?

3            MR. BENSON:  Thank you, Your Honor.

4                  CROSS-EXAMINATION

5    BY MR. BENSON:

6    Q.    Detective[sic] Eaton, I'm Billy Benson, I

7    represent Durrell Bester.  I want to make sure on

8    one thing.  You testified early on that part of

9    your job as an investigator was to purchase drugs

10   from alleged drug dealers, correct?

11   A.    Yes, sir.

12   Q.    But you didn't actually purchase any from

13   Mr. Bester?

14   A.    I did not.

15   Q.    Okay.  All right.

16          And you were not there when the initial

17   surveillance was going on, correct?  You didn't

18   join up until Mr. Bester had gotten to his

19   mother's apartment, correct?

20   A.    Halfway between his residence and his

21   mother's apartment.

22   Q.    So you were there when he and the white male

23   went upstairs or went into his mother's apartment?

24   A.    Yes, sir.

25   Q.    Okay.  But you didn't go inside with Mr.

1  Bester and the white male?

2  A.    No, sir.

3  Q.    Okay.  So you have no idea what they did

4  while they were inside?

5  A.    No, sir.

6  Q.    Okay.  And you said my client was carrying,

7  or Mr. Bester was carrying a bag?

8  A.    Yes, sir.

9  Q.    Could you describe the bag?

10 A.    It was a white plastic bag, typical of what

11 you get at the grocery store.

12 Q.    Like a Wal-Mart grocery bag --

13 A.    Yes, sir.

14 Q.    -- something I have like a thousand of in

15 the drawer next to my refrigerator, to put wet

16 clothes in, trash that sort of thing?

17 A.    Yes, sir.

18 Q.    So nothing distinctive about that bag?

19 A.    You're correct.

20 Q.    Okay.  All right, and then Mr. Bester and

21 the white male came back out, and y'all followed

22 him for a time.  How far did you follow them?

23 A.    We followed them quite a ways from Center

24 Point all the way to Homewood, waiting for the

25 patrol unit to get caught up to us.

1    Q.    Okay.  So Center Point to Homewood that's,
2    you know, 15 --
3    A.    15 miles or so.
4    Q.    -- 15 miles or so?
5          Okay.  And just so we're clear, Mr. Bester
6    was a passenger in the car?
7    A.    Yes, sir.
8    Q.    Okay.  And it was not his vehicle?
9    A.    No, sir.
10   Q.    Okay.  And the black plastic box, to your
11   knowledge, was it -- Did anybody check it for
12   fingerprints or?
13   A.    No, sir.
14   Q.    Okay.  There is a cell phone in there, did
15   anybody check to see whose cell phone it was?
16   A.    No, sir.
17   Q.    And you've been an investigator five years,
18   as part of Sheriff's Department for 14?
19   A.    Yes, sir.
20   Q.    Okay.  And you said you did eventually
21   execute a search warrant on Mr. Bester's
22   residence, a house?
23   A.    Yes, sir.
24   Q.    But you didn't find anything that you
25   brought -- charged against him?

1  A.     That's correct.

2              (Brief pause.)

3  Q.     Okay.  I think I asked this, but let me make

4  sure.  You said the driver declined consent to

5  search the vehicle?

6  A.     Yes, sir.

7  Q.     Mr. Bester was not the driver?

8  A.     No, sir.

9  Q.     And it wasn't his vehicle?

10 A.     That's correct.

11 Q.     Okay.

12              MR. BENSON:  That's all I have, Your

13       Honor.

14                   REDIRECT EXAMINATION

15 BY MR. ANDERTON:

16 Q.     The black box came out of the piece of the

17 luggage that Mr. Bester claimed; is that right?

18 A.     Yes, sir.

19 Q.     Okay.

20              MR. ANDERTON:  That's all.

21              MR. BENSON:  One quick question, Your

22       Honor.

23                   RECROSS-EXAMINATION

24 BY MR. BENSON:

25 Q.     Other than your testimony that Mr. Bester

1  told you that that was his luggage, you have no

2  other evidence that that was his luggage?

3  A.    No, sir.

4  Q.    Okay.

5        MR. ANDERTON:  Nothing further from

6        this witness, Your Honor.

7        THE COURT:  All right.  Ladies and

8        gentlemen of the jury, if you have a burning

9        question in your mind as a result of Officer

10       Eaton's -- Deputy Eaton's testimony, I will

11       allow you to ask it if it is admissible.

12       This is not an opportunity to become a

13       lawyer all of sudden.  But it is an

14       opportunity to clear a question you may have

15       remaining in your mind as a result of the

16       witness's testimony and the lawyer's

17       questioning.  And the procedure is that, if

18       you wish to ask a question I will allow you

19       to ask the question, I will approve the

20       question, and then the witness will answer.

21       Once you receive the answer from the

22       witness, you should not comment concerning

23       the witness's answer.  Okay.

24       Does anyone have a question for Deputy

25       Eaton -- Yes, sir?

```
 1              A JUROR:  I'm not sure if I'm allowed
 2     to ask it or not.  Is there a reason why the
 3     box wouldn't have been fingerprinted?
 4              THE COURT:  Do you know the answer to
 5     that question?
 6              THE WITNESS:  Because Mr. Bester had
 7     owned up to owning the luggage.  I didn't
 8     see the need to have it fingerprinted,
 9     because he'd already told me that the bag
10     that it was in was his.
11              THE COURT:  Anyone else?
12              Yes, ma'am?
13              A JUROR:  I'm just trying to understand
14     where was the white plastic bag found?  Was
15     it found at the house or at the apartment?
16              THE COURT:  Can you answer?  Do you
17     know the answer?
18              THE WITNESS:  Yes, sir --
19              MR. BENSON:  But, Your Honor --
20              THE COURT:  Come up.
21                  (Side bar.)
22              THE COURT:  Okay.  He can't answer that
23     question.
24              A JUROR:  He cannot.
25              THE COURT:  He cannot.  Okay.
```

```
 1                He cannot, that's all I can say.
 2                Anyone else?
 3                     (No response.)
 4                THE COURT:  Any follow-up then for the
 5           State?
 6                MR. ANDERTON:  No, sir.
 7                THE COURT:  I'm sorry.  Yes, sir?
 8                A JUROR:  I want to ask a question.
 9           Where was the -- was the plastic bag in the
10           truck -- when they stopped them was the
11           plastic bag in the truck, when he was taken
12           to his mother house?
13                THE COURT:  Okay.  He can't answer
14           that.
15                Any follow-up for the defense?
16                MR. BENSON:  No, Your Honor.
17                THE COURT:  All right.  You may stand
18           down.
19                     (Witness is released.)
20                THE COURT:  Who's your next witness
21           State?
22                MR. ANDERTON:  Judge, we call -- the
23           State would called Ali Daniels, please.
24                THE COURT:  Ali Daniels
25                MR. BENSON:  Judge, may we approach?
```

```
1                    THE COURT:  Uh-huh.
2                       (Off the record discussion.)
3                    DEPUTY ALI DANIELS,
4                    A witness for the State,
5          Was duly sworn and testified as follows:
6                    THE COURT:  Have a seat, get
7          comfortable, scoot up towards the
8          microphone, and watch your knees down there.
9                       (Witness complies.)
10                   THE COURT:  State your full name for
11         the record, please, sir.
12                   THE WITNESS:  Okay.  Ali Daniels.
13                   THE COURT:  Go ahead.
14                   DIRECT EXAMINATION
15   BY MR. ANDERTON:
16   Q.    Deputy Daniels, let me get you to spell your
17   first name and your last name for the benefit of
18   the court reporter, please.
19   A.    Okay.  First name is Ali, A-L-I.  Last name is
20   Daniels, D-A-N-I-E-L-S.
21   Q.    All right.  Deputy Daniels, who do you work
22   for?
23   A.    The Jefferson County Sheriff's Department.
24   Q.    In what capacity -- What do you do?
25   A.    Center Point patrol.
```

1  Q.    Okay.  How long have you been with the
2  Jefferson County Sheriff's Office?
3  A.    Going on 12 years now.
4  Q.    All right.  During that time have you always
5  been patrol deputy?
6  A.    No, sir.
7  Q.    Okay.  What were your other duties?
8  A.    Before I was on patrol, I worked inside the
9  Corrections Facility.
10  Q.    All right.
11  A.    For Jefferson County.
12  Q.    All right.  How long did you work over
13  there?
14  A.    Four years and like four months.
15  Q.    Okay.  So you've been patrol for about
16  eight?
17  A.    About -- yeah, give or take.  A little bit.
18  Q.    All right.  Deputy Daniels, let me direct
19  your attention to March 24th, 2008.  Do you know a
20  deputy by the name of Mark Eaton with the
21  Sheriff's Office?
22  A.    Yes, sir.
23  Q.    All right.  And did you have occasion to
24  respond to an area here in Jefferson County on the
25  24th of March 2008.

1    A.    Yes, sir.

2    Q.    All right.  What was your purpose in

3    responding?

4    A.    To make a traffic stop.  And identify him.

5    Q.    All right.  When you are on patrol and more

6    specifically on the 24th of March, 2008 when you

7    were on patrol, were you in a marked unit?

8    A.    I was.

9    Q.    All right.  And that's got the lights, and

10   that's got the siren, and that's got all the

11   markings on the side of car?

12   A.    Yes, sir.

13   Q.    All right.  Do you know what kind of vehicle

14   Mark Eaton was in?

15   A.    At the present time of the call, I didn't

16   know.

17   Q.    Okay.

18   A.    If I'm not mistaken back then, I want to say

19   it was a van.

20   Q.    Okay.

21   A.    I could be wrong, but I think it was a van,

22   at the time.

23   Q.    All right.  And on that occasion did you in

24   fact pull an automobile over?

25   A.    I did.

1    Q.    All right.   What kind of an automobile did

2    you pull over?

3    A.    It was a pickup, blue in color.

4    Q.    Okay.   And at that time, did you come to

5    know a fellow by the name of Durrell Bester?

6    A.    Yes, sir.

7    Q.    All right.   Do you see Mr. Bester in court

8    today?

9    A.    Yes, sir.

10   Q.    Would you point him out and tell me what

11   he's wearing today, please?

12   A.    Black man with the white button down shirt

13   and a blue tie (pointing).

14         MR. ANDERTON:  Okay.  Let the record

15         reflect that the witness has indicated the

16         Defendant, Durrell Bester.

17         THE COURT:  So noted.

18   Q.    Now, at the time that you pulled them over,

19   could you tell if anything at all about where Mr.

20   Bester was located in the car?

21   A.    He was the driver of the vehicle.  At the

22   time, I was talking to him I saw somethings, as far

23   as like reaching up around the seat.  I couldn't

24   tell what it was --

25   Q.    All right.  He was the driver?

1    A.    If I'm not mistaken, it was a little over a
2    year ago.   I want to say he was the driver.
3    Q.    Okay.   All right.   Wasn't Mr. Bester removed
4    from the car?
5    A.    He was.
6    Q.    Okay.   And did you in fact -- Well, when
7    Mr. Bester was removed from the car where was he
8    placed?
9    A.    In the back seat of my patrol car.
10   Q.    All right.   Mark Eaton, does he also run the
11   K-9 Unit?
12   A.    He does.
13   Q.    Or one of the drug dogs?
14   A.    Uh-huh.
15   Q.    All right.   And did you -- were you present
16   when the drug dog sniffed around the vehicle?
17   A.    I was.
18   Q.    All right.   Did you -- did you see whether
19   or not that dog indicated or do you know?
20   A.    I saw where he indicated.
21   Q.    Okay.
22   A.    I don't know much about K-9 training when it
23   comes to searching.
24   Q.    I understand.
25   A.    But I guess, when it picked up a scent or

1    whatever it stopped and gave a signal.

2    Q.    Okay.  All right.  And at that time, to your

3    knowledge, was something collected from that

4    truck?

5    A.    It was.

6    Q.    All right.  And who did that collection?

7    A.    Eaton.  Mark Eaton.

8    Q.    All right.  Deputy, where did you stop that

9    particular truck?

10   A.    This particular day it was on Valley Road, I

11   know it was a parking lot of Arby's, I can't

12   remember the cross street.

13   Q.    Okay.

14   A.    At that particular time it was in the parking

15   lot of Arby's, on the back end of it.

16   Q.    Was that here in Jefferson County?

17   A.    Yes, sir.

18   Q.    Was it in the Birmingham Division of

19   Jefferson County?

20   A.    Yes, sir.

21           MR. ANDERTON:  That's all I have for

22        this witness, Your Honor.

23           THE COURT:  Cross?

24                  CROSS-EXAMINATION

25   BY MR. BENSON:

1  Q.    Real quick questions, Deputy Daniels.

2  You're saying Mr. Bester was driving the vehicle.

3  Was it his vehicle?

4  A.    I really don't remember if it was registered

5  in his name or not, at that time.

6  Q.    Okay.  And you weren't part of the actual

7  search?

8  A.    No, I wasn't -- No, I didn't do any searching

9  at that point in time.

10 Q.    When Durrell was placed -- he was placed in

11 your vehicle, correct?

12 A.    Yes.

13 Q.    Did you conduct a search of him before you

14 placed him in your vehicle --

15 A.    I patted him down for officer safety.

16 Q.    Did find anything on him at that time?

17 A.    No, I didn't.

18 Q.    No illegal drugs?

19 A.    Huh-uh.

20 Q.    No drug paraphernalia?

21 A.    No.

22       MR. BENSON:  That's all I have.

23       MR. ANDERTON:  I have nothing further

24       for Deputy Daniels.  May he be excused, Your

25       Honor?

```
 1              I'm sorry, I forgot.
 2              THE COURT:  Any questions for Deputy
 3         Daniels?
 4                   (No response.)
 5              THE COURT:  All right.  Then, Deputy
 6         Daniels, you may now be excused.
 7                   (Witness is released.)
 8              THE COURT:  State, call your next
 9         witness.
10              MR. ANDERTON:  The State calls Hattie
11         French.
12                   SERGEANT HATTIE FRENCH,
13              A witness for the State,
14         Was duly sworn and testified as follows:
15              THE COURT:  Have a seat, get
16         comfortable, scoot up towards the
17         microphone, and watch your knees down there.
18                   (Witness complies.)
19              THE COURT:  Go ahead, State.
20                   DIRECT EXAMINATION
21    BY MR. ANDERTON:
22    Q.    Tell us your name, please.
23    A.    Hattie French.
24    Q.    All right.  For purposes of the court
25    reporter, please spell your first and last name?
```

```
 1   A.      H-A-T-T-I-E.  F-R-E-N-C-H.
 2   Q.      All right.  Ms. French, where do you work?
 3   A.      Jefferson County Sheriff's Department.
 4   Q.      In what capacity?
 5   A.      Sergeant of Vice and Narcotics.
 6   Q.      All right.  As sergeant of Vice and
 7   Narcotics, what do you do?
 8   A.      I supervise the Vice and Narcotics Unit.
 9   Q.      All right.  How long have you been the
10   supervisor?
11   A.      About three years.
12   Q.      How long have you been a sergeant?
13   A.      I've been a sergeant about three years.
14   Q.      Okay.  How long have you been with the
15   Sheriff's Office?
16   A.      About 29.
17   Q.      Okay.  Sergeant French, were you working
18   with the Sheriff's Office on March 24th, 2008?
19   A.      Yes, I was.
20   Q.      All right.  And did you have an occasion to
21   participate in the investigation and potential
22   execution of a search warrant of the residence of
23   Durrell Bester?
24   A.      Yes.
25   Q.      Okay.  What was your part in it -- Now, that
```

1  afternoon did you have occasion to be doing

2  anything in the area around the residence of

3  Durrell Bester?

4  A.    Yes, I did.

5  Q.    What were you doing?

6        THE COURT:  Let me ask you something.

7      And maybe I slept through it.

8        But has anybody mentioned a time of

9      day?

10      MR. ANDERTON:  I'm sorry?

11      THE COURT:  I keep waiting to hear --

12      MR. ANDERTON:  -- a time of day?

13      THE COURT:  -- if it was morning,

14      afternoon, night, whatever.

15      MR. ANDERTON:  I don't think anybody

16      has, Your Honor.  But I will be more than

17      happy.

18      THE COURT:  It would be nice.

19      MR. ANDERTON:  Yes, sir.

20  Q.    Where was the search warrant to be executed?

21  A.    It was on -- the address was 1368 5th Place

22  Northwest.

23  Q.    All right.  And when you were around the

24  apartment, what time of day was it?

25  A.    That was the house where the search warrant

1   was to take place.

2   Q.   Okay.  All right.  And at that time, about

3   what time was it?  About?

4   A.   It was in the afternoon.

5   Q.   Okay.  Late, later afternoon?

6   A.   Early afternoon.

7   Q.   Okay.  All right.  You said you were running

8   surveillance on the house, what do you mean?

9   A.   We was doing -- we went by to check and see

10  if the vehicle was at the house.

11  Q.   Okay.  And who is "we"?

12  A.   Myself and Deputy Washington.

13  Q.   Okay.  Is that the Deputy Jude Washington?

14  A.   Yes, sir.

15  Q.   Okay.  Other than driving by the house, were

16  you watching it from a distance or -- on the TV

17  and movies going to tell us about surveillance

18  siting down the block, kind of looking at it

19  through binoculars, is that what y'all were doing?

20  A.   We was parked down the street where we could

21  --

22  Q.   Okay?

23  A.   -- have visual on the driveway.

24  Q.   Okay.

25  A.   And the house.

1   Q.     Okay.  Did you see anything happen?

2   A.     Yes, we did.

3   Q.     What did you see?

4   A.     Saw an older model blue pickup truck,

5   occupied twice by two white males, come driving up

6   the street at a high rate of speed.  Pull into the

7   driveway.  Backed back, and then one of the white

8   males got out and went to the porch area.  Black

9   male came out of the house and they went to

10  throwing stuff in the back of the pickup truck.

11  And then, all three occupants was in the truck and

12  they went down 5th Place and we pulled out behind

13  them.

14  Q.     Okay.  Now, you said there were two white

15  males in the truck, and one of them got out?

16  A.     Yes, sir.

17  Q.     All right.  You said there was a black male

18  there, where did the black male come from?

19  A.     The black male came out of the house.

20  Q.     All right.  Do you know a fellow -- or have

21  you come to know a fellow by the name of Durrell

22  Bester?

23  A.     Yes, sir.

24  Q.     All right.  And do you see him in court

25  today?

1    A.    Yes, sir.

2    Q.    All right.  Would you point him out and tell

3    me what he is wearing today?

4    A.    He is sitting right there (pointing) and he

5    has on a white shirt, and a black and white tie.

6    Q.    All right.

7              MR. ANDERTON:  Let the record reflect

8          the witness has indicated Durrell Bester.

9              THE COURT:  So noted.

10   Q.    Now, the black male you saw, who was

11   throwing stuff into the back of this truck with

12   the white male; do you know who that black male

13   was?

14   A.    The black male was Durrell Bester.

15   Q.    Okay.  Okay.  So you saw Mr. Bester -- Can

16   you tell us what kind of stuff he was putting in

17   the back of the truck, from what you could tell?

18   A.    There was -- I saw some white bags, there was

19   like luggage, a black, like, a gym bag and

20   clothes -- Clothes --

21   Q.    Uh-huh.

22   A.    And he had a white bag in his hand.

23   Q.    Okay.  What did he do with that white bag?

24   A.    He got inside of the truck.

25   Q.    Okay.  Did he take that white bag into the

1    truck or did he put in the bed with everything

2    else?

3    A.    He took it inside the truck.

4    Q.    Into the truck?

5    A.    Into the truck.

6    Q.    Okay.  Now, you said that the truck pulled

7    off and then y'all followed it?

8    A.    Yes, we did.

9    Q.    Where did you follow it to?

10   A.    We followed it over to some apartments on

11   Huffman Road.

12   Q.    Okay.  When you got there, do you know a

13   fellow by the name of Mark Eaton?

14   A.    Yes, I do.

15   Q.    How do you know Deputy Eaton?

16   A.    He works with the Vice and Narcotics Unit

17   where I supervise.

18   Q.    Okay.  Was Deputy Eaton notified that y'all

19   were moving from the search warrant location?

20   A.    Yes, he did.

21   Q.    All right.  And did he in fact join you over

22   at this apartment complex in Center Point?

23   A.    Yes, he did.

24   Q.    When you got to that apartment complex, can

25   you tell us what, if anything, you saw?

1    A.    I observed the white male and the black male,
2    who was Mr. Bester, get out of the vehicle.  He had
3    a larger white bag in his hand.  Like a garbage
4    bag --
5    Q.    Okay.  Who had that --
6    A.    I think the white male had the larger garbage
7    bag.
8          The smaller bag, Mr. Bester had it, and also
9    he went -- they went inside this apartment, I think
10   it was apartment E. The white male come back out
11   and got a piece of electronic equipment, looked
12   like a game or something.  And he went back inside
13   the apartment.
14         And they were in there for, I guess, five or
15   six minutes, and they both come out and drove off.
16   Q.    Now, the white bag that you saw Mr. Bester
17   carry into the apartment, did it appear to be
18   consistent with the white bag that you saw him
19   bring out of his residence?
20   A.    Yes.
21   Q.    And put in the front part of the truck with
22   himself and not in the bed?
23   A.    Yes.
24   Q.    Okay.  All right.  When Mr. Bester left the
25   apartment, did he have that white bag with him?

```
 1   A.     No, he did not.
 2   Q.     Okay.  What happened once the white male,
 3   who went inside the apartment, and Mr. Bester, who
 4   went inside the apartment, once they came out of
 5   the apartment and got back in the truck; what
 6   happened then?
 7   A.     They drove off, and the -- there was a female
 8   that came out of the house and went around the
 9   corner, went across the street, like she was going
10   to the store.
11   Q.     Okay.  Let me show you what has been marked
12   as State's Exhibit 2 for identification purposes.
13          See if you recognize that photograph,
14   please?
15                   (Witness reviews exhibit.)
16   A.     This is she.
17   Q.     Okay.  Is that the female that went out like
18   she was going to the store?
19   A.     Yes.
20   Q.     Okay.
21          Now, what did you do when she left the
22   apartment?
23   A.     We stayed at the apartment.  Myself and
24   Deputy Washington stayed at the apartment.
25   Q.     Okay.  All right.  And did anybody follow
```

1   this woman who left?

2   A.    Yes.   There was some more deputies that

3   followed them.

4   Q.    Okay.   All right.   Did she, in fact, return

5   to the apartment?

6   A.    She did return.

7   Q.    When she returned, what if anything did you

8   do at that point?

9   A.    Myself, Deputy Washington, Deputy Hail and

10  Deputy Finley and Deputy Morris.   We walked up to

11  her to talk to her.   I introduced myself to her and

12  advised her who I was.

13       And told her -- asked her could I come in

14  and talk with her.   And she -- matter of fact she

15  stood right there at the door to talk to me.   And I

16  did explain to her who I was and why I wanted to

17  talk to her.   I told her I wanted to talk to her

18  concerning her son.

19  Q.    Okay.

20  A.    And she said come in.

21  Q.    Did she tell you who she was?

22  A.    She said she was -- she said her name was

23  Dorothy Bester.   I think that's what she said.

24  Q.    All right.   And is that the same lady who

25  was pictured in the photograph that had been

1    marked State's Exhibit No. 2 for identification?

2    A.    Yes, it is.

3    Q.    All right. And is that how that lady

4    appeared on that particular occasion?

5    A.    Yes, sir.

6          MR. ANDERTON: State would move to

7          introduce State's Exhibit No. 2.

8          MR. BENSON: No objections.

9          THE COURT: 2 is in.

10          (Whereupon, State's Exhibit Number

11          2 was received into evidence.)

12          THE COURT: What address was she at?

13          THE WITNESS: She was at ████████████

14    ████████████████████

15    Q.    Is ███████████████████████████ here in

16    Jefferson County?

17    A.    Yes, it is.

18    Q.    Is it in the Birmingham division of

19    Jefferson County?

20    A.    Yes, it is.

21    Q.    All right. In your talking with Ms. Bester,

22    did she indicate to you that you could look around

23    her apartment? How did that conversation take

24    place?

25    A.    I explained to her that we had followed her

1   son from over on 5th Place to that apartment.

2   Q.      Okay.

3   A.      And she said something that he had gotten

4   into it with his girlfriend.

5   Q.      Okay.

6   A.      And I told her that we was doing surveillance

7   on him, he was under investigation, that we were

8   actually doing surveillance on him.

9   Q.      Okay.

10  A.      And she just -- she was said, okay.  And then

11  I told her that when her son got out of his vehicle

12  -- out of the vehicle, that he had a white bag in

13  his hand.  And I said, he brought it into the

14  apartment.  When he left he did not have it.  Can

15  you tell me what he did with the bag.

16  Q.      Uh-huh.

17  A.      And she said, "Am I going to jail?"

18          And I said, "No, ma'am you are not part of

19  our investigation, your son is."

20          And I say, "If you don't mind, can we look

21  around?"

22          And she said, "Yes", I said, "Well, let me

23  let you sign a consent form first."

24          She said, "Come on I'll show you."

25          I said, "No, let us take care of this

```
 1   first."
 2   Q.    Okay.  Do you have that consent form with
 3   you?
 4   A.    I don't have it.
 5   Q.    All right.
 6                     (Whereupon, the prosecutor is
 7                     showing defense counsel an
 8                     exhibit.)
 9                     (Whereupon, State's Exhibit Number
10                     15 was marked for identification.)
11              MR.  BENSON:   Your Honor, may we
12         approach?
13              THE COURT:  Sure, come on up.
14                     (Side bar off the record.)
15   Q.    Let me show you what has been marked for
16   identification purposes, State's Exhibit No.  15.
17         Do you recognize what State's Exhibit 15
18   is?
19                     (Witness reviews document.)
20   A.    Yes.
21   Q.    All right.  Now, is that a consent to search
22   form that Ms. Bester signed?
23   A.    Yes, it is.
24   Q.    All right.  Is that the original?
25   A.    This is a copy.
```

1   Q.   Okay. All right. The original that Ms.

2   Bester signed, did it look exactly like that?

3   A.   Yes.

4   Q.   Does State's Exhibit 15 appear to be

5   different in any manner at all, with the exception

6   of the State's sticker? And I don't know whether

7   your original had holes up in the top.

8       But with those two exceptions did the

9   consent to search that Ms. Bester signed appear to

10   be exactly the way that piece of paper appears?

11   A.   Yes. Only other thing that the star may have

12   been gold.

13   Q.   Okay. All right?

14   A.   And it appears to be the same.

15   Q.   All right. When Ms. Bester signed that

16   piece of paper, or excuse me, the original of that

17   -- Well, first of all, do you know where the

18   original is?

19   A.   It should be with Deputy Eaton's case file.

20   Q.   Okay. Do you have access to Deputy Eaton's

21   case file?

22   A.   I don't have it.

23   Q.   Okay.

24   A.   I'm sure -- it should be in the office with

25   the records.

1    Q.    Okay.

2    A.    Should be.

3    Q.    All right.  Again, does State's Exhibit 15

4    appear to be substantially the same as the

5    original in this particular case?

6    A.    Yes.

7    Q.    All right.  And are copies of consent to

8    search form are they normally kept by the

9    Sheriff's Office.

10   A.    (Pause) Yes --

11   Q.    Or do we just keep the originals?

12   A.    What you mean?

13   Q.    Okay.  Is this a Xerox copy of the

14   original --

15   A.    That's a Xerox copy.

16   Q.    Okay?

17   A.    When we give them to the D.A., we give the

18   D.A. a Xeroxed copy?

19   Q.    All right.  And does that appear to be a

20   Xeroxed copy of this particular form?

21   A.    Yes, it does.

22   Q.    All right.  Now, prior to Ms. Bester signing

23   that form, did Ms. Bester tell you it was all

24   right for you to come inside her apartment?

25   A.    Yes, she did.

1   Q.    All right.  And did she indicate to you that

2   she would in fact show you around her apartment?

3   A.    Yes, she did.

4   Q.    All right.  And that was prior to her ever

5   signing that particular piece of paper?

6   A.    That's correct.

7   Q.    All right.  You asked her to sign a consent

8   form?

9   A.    I asked her to sign a consent form.

10  Q.    The writing on that document is whose

11  writing?

12  A.    I want to say it's Deputy Roger Morris.

13  Q.    Okay.  All right.  Were you present when the

14  consent to search form was filled out?

15  A.    Yes, I was.

16  Q.    All right.  And did you in fact see Ms.

17  Bester sign that particular form?

18  A.    I did.

19  Q.    Do you know if anyone read that form to Ms.

20  Bester prior to her signing it?

21  A.    Yes.

22  Q.    Who did?

23  A.    I read it to her.

24  Q.    Okay.  Tell us if you will what you read to

25  Ms. Bester prior to her signing the form?

1  A.     Okay.  It says:

2         "Consent to search premises, State of

3  Alabama, Jefferson County.  I am, and then the

4  individual's name, a resident of whatever the

5  address is, do voluntarily consent and authorize

6  the following deputy sheriffs:  Morris, Finley,

7  Sergeant French and Washington to search my

8  premises located at 1037 Apartment E Birmingham.

9         "To determine whether or not there is any

10 illegal narcotics or stolen property on my

11 premises.  I hereby certify that I am over 18 years

12 of age and have a possessory interest into the

13 items of the said premises.

14        "I have not been -- I have not been made any

15 threats or promises by the above named personnel.

16 This 24th day March, 2008.

17        "I further affirm that I have been advised

18 of my constitutional rights."

19 Q.     All right.

20 A.     And then it's signed and then it has two

21 witnesses.

22 Q.     All right.  Who were the witnesses?

23 A.     I think Roger Morris and myself.

24 Q.     Okay.  And did both of you watch Ms. Bester

25 sign that particular form?

```
 1   A.    Yes.  Sitting in her living room.
 2   Q.    Does that form appear to be an exact copy --
 3   an exact duplicate of the original form?
 4   A.    Yes.
 5   Q.    With the exception of that gold star up at
 6   the top, in that photograph -- I mean in that
 7   Xeroxed copy is black and white?
 8   A.    Yes.
 9   Q.    The holes and the State sticker?
10   A.    That's it.
11   Q.    But does it appear to be an exact duplicate?
12   A.    It does.
13   Q.    Other than those items?
14   A.    It does.
15              MR. ANDERTON:  State would move to
16         introduce State's Exhibit 15.
17              MR. BENSON:  Defense would object based
18         on our discussion.
19              THE COURT:  15 is in.
20                  (Whereupon, State's Exhibit Number
21                   15 was received into evidence.)
22   Q.    Now, Sergeant French, once Ms. Bester signed
23   that form, did she take you anywhere in the
24   apartment?
25   A.    Yes, she did.
```

1    Q.    Where did she take you?

2    A.    She carried me in the second bedroom.

3    Q.    When you got to the second bedroom, what did

4    you do or what did she say while y'all were there?

5    A.    She said, "He put the bag over there".

6    Q.    All right.

7         And where was she pointing when she said,

8    over there?

9    A.    In the corner behind, like a, little stereo.

10   Q.    Okay.   Let me show you State's Exhibit No.

11   3.

12                    (Whereupon, the Court reviews

13                    exhibits.)

14   Q.    Let me show you State's Exhibit No. 3 and

15   ask you if you recognize that.

16                    (Witness reviews exhibit.)

17   A.    Yes.

18   Q.    What is that a photograph of, please?

19   A.    This is a photograph of the bedroom where,

20   over in the corner, where the radio is sitting up

21   on top of the --

22              THE COURT:   We're still talking about

23         1037 --

24              THE WITNESS:   Apartment E.

25              MR. ANDERTON:   Apartment E.  Yes, sir.

```
1                    THE COURT:  Huffman Road?
2                    THE WITNESS:  Yes, sir.
3                    THE COURT:  Okay.
4    Q.    All right.  State's Exhibit No. 4 -- I tell
5    you what, I'm going to ask you to take a look at 4
6    through 9 -- 3 through 9.
7                        (Witness complies.)
8    Q.    And ask you if you recognize each of those
9    photographs.
10   A.    Yes.
11   Q.    All right.  And what do Exhibits 3 through 9
12   show, please?
13   A.    It shows the bedroom and the place where the
14   bag is located.
15   Q.    Okay.  Do each of the photographs State's
16   Exhibit 3 through 9 truly and accurately depict
17   that area as it appeared at the time of your
18   consent to search given to you by Ms. Bester on
19   the 24th of March, 2008?
20   A.    Yes, it does.
21   Q.    All right.
22                    MR. ANDERTON:  State would move to
23            introduce State's Exhibits 3 through 9.
24                    MR. BENSON:  No objection.
25                    THE COURT:  They're in.
```

```
 1                    (Whereupon, State's Exhibit
 2              Numbers 3, 4, 5, 6, 7, 8 and 9
 3              were received into evidence.)
 4         MR. BENSON:  Judge, may I have the
 5      witness step down and show the jury what
 6      each of the photographs are?
 7         THE COURT:  You may.  You may publish.
 8         MR. ANDERTON:  Thank you.
 9              (Whereupon, the witness complies.)
10         MR. BENSON:  Your Honor, is it okay if
11      I move over here where I can see as the --
12         THE COURT:  Sure.
13 Q.    This is State's Exhibit No. 3.  Tell us what
14 this shows, please.
15 A.    This is the bedroom.  This is the corner
16 right here (indicating), and that's a portable
17 radio.  And the bag was behind it.
18 Q.    Okay.  State's Exhibit No. 4?
19 A.    Okay.  This is a close-up of the stereo that
20 was in the corner, where the bag was behind it.
21 Q.    When Ms. Bester pointed out the corner with
22 the radio.
23 A.    Uh-huh.
24 Q.    Could you see the bag when she first pointed
25 it out?
```

1    A.    No, I could not.

2    Q.    All right.  What did you do when she pointed

3    out the corner with the radio?

4    A.    I went over and looked behind it and saw

5    there was a bag.

6    Q.    And you could see the bag at that --

7    A.    I could see the bag at that point.

8    Q.    Let me show you State's Exhibit No. 5.  And

9    ask you what that is.

10   A.    Okay.  That's the stereo (indicating), and

11   that's the bag behind it (indicating) in the

12   corner.

13   Q.    Okay.  And have you pulled the bag up at

14   some point or is it just -- -

15   A.    No, it was just like that.

16   Q.    Just like that.  All right.

17         But we couldn't see it in that picture.

18   A.    Because the angle of the -- the angle of the

19   camera was just straight ahead, but when they beam

20   down on it, turn the camera over, it will be seen.

21   Q.    Okay.  Once you looked over the top of it?

22   A.    Yeah.  Look over the top.

23   Q.    Okay.  State's Exhibit No. 6?

24   A.    Okay.  That's the bag.  And it was pulled up,

25   lifted it up.  Some one is holding it, and the

1   picture was taken.

2   Q.    Okay.  And State's Exhibit No. 7?

3   A.    Okay.  This is the items that was inside the

4   bag and was put on the bed.  And photograph was

5   taken.

6   Q.    What are those items?

7   A.    Electronic digital scales and what appears to

8   be cocaine.

9   Q.    Okay.

10          MR. ANDERTON:  Judge, may I pass these

11       around?

12          THE COURT:  Didn't you just let them

13       look at them?

14          MR. ANDERTON:  I did.  They were more

15       over here.  That's okay, I'll leave them

16       here.

17   Q.    All right.  Sergeant French, did you then

18   examine that contents of what was in the plastic

19   bag?

20   A.    Yes, we did.

21   Q.    What was in the plastic bag?

22   A.    In the plastic bag was cocaine, what appeared

23   to be cocaine, and some digital scales.

24   Q.    Okay.  Was that cocaine in fact collected.

25   A.    It was collected.

```
 1   Q.     All right.  And who collected it?
 2   A.     I'm not exactly sure who collected it.
 3   Q.     Do you know who that is?  L.A.G.
 4               (Witness reviewing exhibit.)
 5           MR. BENSON:  Your Honor, I believe she
 6       has testified she doesn't know who collected
 7       the cocaine.
 8           THE COURT:  Are you going somewhere?
 9   Q.     All right.  Have you had a chance to -- Let
10   he show you State's Exhibit No. 14.
11   A.     Okay.
12   Q.     All right.  And do you recognize that
13   particular package?
14   A.     I didn't see it after it was packaged.
15   Q.     Okay.
16   A.     The deputies would have done that.  So I
17   didn't have anything --
18   Q.     All right.  In examining State's Exhibit No.
19   14 do you recognize those particular initials?
20   A.     These initials tell me who sealed it.
21   Q.     All right.  And who would that be?
22   A.     Deputy Gast.
23   Q.     Okay.  And does it indicate who that item
24   was recovered by?
25   A.     It was recovered by me.
```

1  Q.     Okay.   And the Detective is?

2  A.     Deputy Gast.

3  Q.     Gass, G-A-S-S?

4  A.     G-A-S-T.

5  Q.     G-A-S-T, Gast.

6         Okay.   When you turned these items over to

7  Deputy Gast, do you recognize the contents of

8  what's in --

9  A.     Yes.

10  Q.     -- 14?

11  A.     Yes.

12  Q.     Okay.   All right.   Do you recognize those

13  items?

14  A.     Yes, I do.

15  Q.     All right.   Do those appear to be the same

16  items --

17  A.     It appears to be the same.

18  Q.     Okay.   Did you perform any tests on what

19  appeared to be cocaine, out on the scene that day?

20  A.     I'm not sure where I did it or I directed one

21  of the other deputies.   We do, do a field test.

22  Q.     Just do a field test.   That does what?

23  A.     I use this little tester, and you put just a

24  little of the substance and it will turn a certain

25  color.

1   Q.     Okay.   And was that a positive test for the

2   presence of cocaine?

3   A.     It was positive.

4   Q.     Okay.   These items were they then collected?

5   A.     They were collected.

6   Q.     Okay.  And turned over to, I guess, they

7   were sealed up by Deputy Gast --

8   A.     They were sealed up by Deputy Gast.

9   Q.     Okay.   All right.   Between the time you

10   collected them to the time you turned them into

11   Deputy Gast, were those items in your care,

12   custody and control the entire time?

13   A.     They were.

14   Q.     Okay.  Did you make any additions or

15   deletions to them?

16   A.     Say what?

17   Q.     Any additions or deletions to them, with the

18   exception of whatever you did for your presumptive

19   test out on the scene.

20   A.     That was it.

21   Q.     Okay.   And were they in the same, or

22   substantially the same, condition when you turned

23   them over to Deputy Gast as they were when you

24   first collected them?

25   A.     Yes.   Like I said, we collected it and

1  brought it back to the office and they packaged it.

2  Q.    Okay.  All right.

3        Now, in addition to those -- that item --

4  Let me see.  Were additional items found in the

5  room?

6  A.    Yes, it was.

7  Q.    Okay.  What else was found there in the

8  room?

9  A.    There was a bag in the floor, a white bag in

10 the floor.  And I think, you can just see there was

11 some scales, some baggies, and a glass Pyrex type

12 cup, that had residue in it that was in the floor.

13 And there was clothes in the floor.

14       And she said that was -- those were his

15 things that he just dropped them and left in the

16 floor.

17 Q.    All right.  Let me show you what's been

18 marked State's Exhibit 13.  Do you recognize that,

19 please?

20              (Witness reviews exhibit.)

21 A.    The digital scales for one thing.

22 Q.    You mentioned a Pyrex item in there.

23       Is that Pyrex item still in one piece?

24 A.    No.  What's left of it.

25 Q.    Okay.  But that was collected out on the

1  scene?

2  A.    It was not broken.   It gotten broken

3  somewhere, over in property.

4  Q.    Okay.   Let me show you what's been marked

5  State's Exhibits No. 8 and 9, which you have

6  previously identified.   And ask you, if you can

7  recognize State's Exhibit 8.

8  A.    Yes.

9  Q.    What is State's Exhibit 8, please?

10 A.    Okay.   That's the bag that's sitting in the

11 floor.   And those are the baggies and some of the

12 other items that were in the bag that was in there.

13 Q.    Okay.   And State's Exhibit No. 9, what does

14 it show?

15 A.    Okay, this is the same bag.   That's the Pyrex

16 dish.   That's another black bag that had the scales

17 in it, and those are the baggies.

18 Q.    Okay.   Those are some of the items found

19 here in State's Exhibit 13; is that correct?

20 A.    That's correct.

21 Q.    All right.   And each of those items was

22 collected and taken to the evidence locker over at

23 the Jefferson County Sherif's Office?

24 A.    It was taken to the Sheriff's Office and the

25 deputy was responsible for storing them.

1   Q.    Okay.  You can have a seat.

2                 (Witness complies.)

3   Q.    Deputy French, was -- To your knowledge,

4   were any other drugs found in that room?

5   A.    Yes.

6   Q.    All right.  And who found the other drugs?

7   A.    I think Deputy Washington.

8   Q.    Okay.  Do you know where those other drugs

9   were found?

10  A.    On the dresser.  Chester drawer.  Yes, it was

11  the chester draw.

12  Q.    Do you know what kind of drugs those were?

13  A.    Yes.

14              MR. BESTER:  Your Honor, can we

15        approach?

16              THE COURT:  Sure.

17                 (Off the record side bar.)

18  Q.    What kind of drugs were in fact found on the

19  dresser?

20  A.    Marijuana.

21  Q.    Let me show you State's Exhibit No. 10.  And

22  ask you if you recognize that, please.

23                 (Witness reviews exhibit.)

24  A.    Yes.

25  Q.    What is that?

1  A.    This is the top of the chester draw or
2  dresser whichever way you want to call it, with the
3  marijuana on top.
4  Q.    Okay.  Have you seen -- you've been with the
5  Sheriff's Office, how long, 29 years?
6  A.    29 years.
7  Q.    29 years.  And you've been with Vice and
8  Narcotics how long?
9  A.    21 years.
10 Q.    Have you had occasion during the course of
11 your 29 years, Sergeant French, to see marijuana?
12 A.    Yes.
13 Q.    On a few or numerous occasions?
14 A.    Yes, numerous.
15 Q.    Numerous?
16 A.    Yeah.
17 Q.    All right.  And did you take a look at the
18 item that was found on the dresser?
19 A.    Yes, I did.
20 Q.    All right.  And did it appear to be
21 marijuana to you?
22 A.    Yes, it did.
23 Q.    Do you know if that item was ever tested?
24 A.    I don't have no idea.  Since it was not my
25 case, I didn't follow-up on that.  I'm not sure.

1    Q.      Okay.

2    A.      Should have been.

3                    (Brief pause.)

4            THE COURT:   Ladies and gentlemen, allow

5    me to give you a limited -- what we call a

6    limiting instruction.

7            I.E., it limits your use of that

8    particular piece of evidence that was

9    State's Exhibit 11[sic].

10           The law says that evidence of other

11   crimes, wrongs, et cetera, may be admissible

12   to show certain things.  Like, knowledge,

13   absence of mistake, knowledge, design,

14   intent, things like that.

15           So State's 11[sic] was not allowed into

16   evidence to prove the basis of the charged

17   offenses, in this case.

18           It was allowed, pursuant to Rule

19   404(b), as evidence of other crimes or

20   wrongs that were done to show a particular

21   theme.  Such as, knowledge, design, intent,

22   absence of mistake, things like that, okay.

23   And that's the only limited purpose that you

24   can use that particular piece of evidence

25   for.

```
 1                    Does that make sense?
 2                    Okay.  Go ahead.
 3   Q.    Sergeant French, the cocaine, or what
 4   appeared to be cocaine out on the scene that you
 5   collected from the plastic bag, behind the radio,
 6   that Ms. Bester showed you and told you that
 7   Mr. Bester had brought into the apartment.  The
 8   cocaine, did it have State tax stamps on that
 9   cocaine?
10   A.    No, it did not.
11   Q.    Did you examine -- how was it packaged?
12   A.    It was in a plastic bag.
13   Q.    Similar to the plastic bags you found on the
14   scene?
15   A.    Yes.
16   Q.    All right.  And did those plastic bags have
17   any kind of tax stamp on them?
18   A.    No, it did not.
19   Q.    Okay.  Did you do you any kind of -- you
20   said you did a presumptive test to determine
21   whether or not the presence of cocaine was there.
22   Did you do any initial weighing of those items?
23   A.    I didn't, no.
24   Q.    Okay.
25   A.    I just looked at and I told about what it
```

1   was.

2   Q.     Okay.

3   A.     Approximately.

4   Q.     Did you have an idea of how many ounces it

5   was or how much it was?

6   A.     No.  I knew it was more than one.  It was

7   more than 28 grams.

8   Q.     Okay.  Have you had a chance during the

9   course of your work with the Vice/Narcotics with

10  the Sheriff's Office to see more than one ounce of

11  cocaine?

12  A.     Yes.

13  Q.     On few or many occasions?

14  A.     Many.

15  Q.     Was this consistent with more than 28 grams,

16  at that point?

17  A.     Yes, it was.

18  Q.     All right.  And those items were in fact

19  sent to the Alabama State Department of Forensic

20  Sciences for tasting and weighing; is that

21  correct?

22  A.     That's correct.

23  Q.     Okay.  (Pause) How many bag -- how many

24  containers, excuse me, of cocaine were there in

25  the plastic bag that you recovered?

```
1   A.      Two, I believe.
2   Q.      Okay.  And did the contents of the two bags
3   look similar to each other?
4   A.      No.  One look like it had more in it than the
5   other.
6   Q.      Okay.  Did they appear to be the same forms
7   of cocaine?
8   A.      No.  One was powder, one was crack.
9   Q.      Okay.  And what is crack?
10  A.      Crack is another form after cocaine that
11  they've cooked.
12  Q.      Uh-huh.
13  A.      They've added some additives to it and they
14  cooked it.
15  Q.      All right.  And is it a cheap form of being
16  able to -- or a cheap form of cocaine, if you
17  will?
18  A.      Yes, it is.
19  Q.      It's easy to distribute?
20  A.      It is easy, yes.
21  Q.      Okay.
22          MR. ANDERTON:  That's all I've got for
23          Sergeant French.
24          THE COURT:  Cross?
25              CROSS EXAMINATION
```

1  BY MR. BENSON:

2  Q.    Sergeant French, I don't think I'm going to

3  take too much of your time.

4            THE COURT:  Hold on one second.

5                 (Off the record.)

6            THE COURT:  Okay.  Go ahead.

7  Q.    Okay.  Sergeant French, you've been doing

8  this for -- working for the Sheriff's Department

9  for 29 years, correct?

10  A.    Yes, sir.

11  Q.    And a supervisor for three years?

12  A.    Yes, sir.

13  Q.    Okay.  And you've got Ms. Bester, according

14  to your testimony, sign that consent waiver in

15  your presences?

16  A.    Yes.

17  Q.    But you didn't bring it to court with you?

18  A.    It was not -- it was not my case.  It was

19  Deputy Eaton's case.  So the paperwork --

20  Q.    Did you bring the waiver with you Sergeant

21  French --

22  A.    It was not my place to bring it.

23  Q.    So that would be no?

24  A.    No. I didn't bring anything.

25  Q.    Okay.  And you testified that you were part

1   of the surveillance, you and I think you said it

2   was Deputy Washington were surveilling of

3   Mr. Bester's residence, correct?

4   A.    Yes.

5   Q.    Okay.  And that a blue pickup with two white

6   males drove up.  And they started throwing stuff

7   in the back of the vehicle, of the pickup truck,

8   correct?

9   A.    That's correct.

10  Q.    What were those items?

11  A.    One looked like maybe a gym bag.  Clothing,

12  you know, you can -- you know, bags with clothes in

13  it.  They was in a hurry so, as far as I can see it

14  looked like somebody was moving or something.

15  Q.    Any luggage?

16  A.    I think it was a couple of luggage, couple of

17  bags of luggage or something.  I don't know whether

18  anything was in it, but.

19  Q.    Do you remember what they looked like?

20  A.    I remember one being black and I can't tell

21  you the exact colors of the other, no.

22  Q.    And you testified that Mr. Bester, Durrell,

23  got into the pickup truck carrying a white bag?

24  A.    He had a smaller white bag, yes.

25  Q.    Okay.  And did you take any photos of this?

1  A.    I didn't.  No, I did not.

2  Q.    Okay.  Y'all were -- Did anybody, to your

3  knowledge?

4  A.    Not that I can remember.

5  Q.    But Mr. Bester was under surveillance?

6  A.    Yes.

7  Q.    And nobody took any photos of what -- of

8  Mr. Bester leaving, these white males coming up?

9  A.    Well, the incident happened so quick, until

10 -- we was unable to take photographs.  Because we

11 was trying to follow them and they was moving.

12        So it was kind of hard.

13        We just went to check to see if the vehicle

14 was there before we executed the warrant.

15 Q.    And you testified y'all followed the

16 vehicle?

17 A.    Yes.

18 Q.    Where did you follow it to?

19 A.    To Huffman Road.  To the apartments.

20 Q.    Okay.  And did it make any stops in between,

21 Mr. Bester's house and the apartment?

22 A.    No, it did not.

23 Q.    It didn't stop at a gas station?

24 A.    Not that I can recall.

25 Q.    Okay.  Got to the apartment, your testimony

1  was that Mr. Bester and one of the white males

2  exited the vehicle?

3  A.    That's correct.

4  Q.    And Mr. Bester went upstairs with a bag?

5  A.    It was --

6  Q.    Smaller white bag?

7  A.    It was on the first level.  It was not an

8  upstairs.

9  Q.    Okay.  I don't know why I keep saying

10  upstairs.  I apologize.

11       But they went into the apartment?

12  A.    Went into the apartment.

13  Q.    Okay.  It is your testimony that Mr. Bester

14  walked into the apartment with a bag, consistent

15  with this (indicating)?

16  A.    Yes.

17  Q.    Okay.  It would also be consistent with the

18  type bag a thousand people walked out of Wal-Mart

19  with last night, wouldn't it?

20  A.    Except I don't see the Wal-Mart sign on it.

21  Q.    Well, same type bag?

22  A.    Uh-huh

23  Q.    Okay.  Before going to Ms. Bester's

24  apartment, had anybody been surveilling or

25  watching her apartment?

1  A.    No.

2  Q.    Okay.  So you don't have any idea who had

3  been to her apartment prior to y'all's arrival?

4  A.    No.  Only thing we know is we followed him

5  there.

6  Q.    Okay.  So you don't know who had been there,

7  what had been brought there, or anything --

8  A.    No.  No, I do not.

9  Q.    Okay.  And just so we're clear, you saw

10 Mr. Bester walk in with a bag consistent with that

11 photograph that I showed you.  But at that time,

12 you didn't look in the bag Mr. Bester was

13 carrying?

14 A.    No, we didn't approach him.  No.

15 Q.    Okay.  So at no time did you find Mr. Bester

16 in possession of a grocery bag containing cocaine?

17 A.    No, he had carried the bag in the house, no.

18 Q.    He carried a bag in the house?

19 A.    Okay.  His mother said he brought that one

20 though.

21 Q.    So what you're telling us is that Durrell's

22 mother took you and showed you where the cocaine

23 was?

24 A.    She showed us the bag -- where he brought the

25 bag -- where he put the bag at when he came in.

1  Q.    And let's go back to where you first went
2  and got to the apartment, and went and talked with
3  his mother.
4  A.    All right --
5  Q.    Or before that, you said she left and went
6  to the store?
7  A.    She went around the corner, I assume she went
8  to the store.
9  Q.    Okay.
10 A.    And she said she went to the store.
11 Q.    Did she come back with anything?
12 A.    I don't remember whether she had anything in
13 her hand, I really don't.
14 Q.    Okay.  Did she have a white bag?
15 A.    She didn't have that white bag.
16 Q.    How do you know that?
17 A.    Because when we was talking to her about the
18 bag.  So if she had had the bag, she would have
19 said here's the bag.  But, no.  She showed us that
20 bag.
21 Q.    Okay.  And you say you asked her if you can
22 come in?
23 A.    Yes.
24 Q.    And y'all talked to her about -- you
25 testified to that y'all been surveilling

1    Mr. Bester, and that you suspected he had drugs in

2    that bag, and you asked if it was okay to search

3    her apartment?

4    A.    Yes.  Uh-huh.  Asked if we could look around.

5    Q.    And you testified you read her that waiver

6    consent -- consent waiver, excuse me?

7    A.    Yes.

8    Q.    Why did you read it to her?

9    A.    Because I wanted to make sure she understood.

10   Because I told her she didn't have to let us look

11   around.

12   Q.    Okay.  And so you explained to her --

13   A.    And she asked was she in any trouble.

14         She said she didn't want to go to jail, was

15   she in any trouble.  I told her, no, she was not.

16   Q.    Was it possible she signed that because she

17   was afraid she was going to go to jail?

18   A.    No, because I told her she wasn't going to go

19   to jail.  That she was not the one that we was

20   investigating.

21   Q.    Okay.  All right, y'all went in the bedroom,

22   found the bag containing cocaine behind the

23   stereo?  Correct?

24   A.    Yes.

25   Q.    And the others items that Mr. Anderton went

1    over with you.

2         Do you have any other evidence, other than

3    Durrell's mother, telling you that Durrell put

4    that bag there, that that bag belonged to Durrell

5    Bester --

6    A.    Huh-uh, no, I don't.

7    Q.    To your knowledge is there any evidence that

8    that bag --

9    A.    No.  No.

10   Q.    Was that bag fingerprinted?

11   A.    No, it's not.

12   Q.    Okay.

13        To your knowledge was anything in the room

14   fingerprinted?

15   A.    No.

16   Q.    Is there any evidence that Mr. Bester was

17   even in that room?

18   A.    Other than the fact that his clothing was

19   there.  And his mother said he went in there.

20   Q.    Okay.  You said his clothing was there, how

21   do know it was his clothing?

22   A.    Well, because she said that bag was his.  It

23   had some tennis shoes in it, she said they belonged

24   to him.

25   Q.    Okay.  And you testified that the white male

1   was carrying a large white bag, correct?

2   A.    Yes.

3   Q.    Do you know what was in that bag?

4   A.    It's my understanding that there were some

5   clothes in the bag.  That it was his clothes in the

6   bag.

7   Q.    Okay.  I'm asking you if you know.  I'm not

8   asking what your understanding --

9   A.    Only thing she said somebody helped him bring

10  some clothing in the house and brought some games

11  in the house so.

12  Q.    And --

13  A.    Because I specifically asked her about the

14  white male.

15  Q.    Okay.  So y'all -- you are outside when

16  Mr. Bester and the white male went into the

17  apartment?

18  A.    Yes.

19  Q.    So you have no idea what they did while they

20  was inside --

21  A.    While they was inside, no.

22  Q.    Okay.  And you then, just so we're clear,

23  you have no idea who had been in the apartment,

24  Ms. Bester's apartment, prior to y'all's arrival?

25  A.    No, I don't.  No.

1    Q.    Okay.  Have no idea the contents of the
2    apartment prior to y'all's arrival?
3    A.    I've never been in that apartment prior to
4    that day.
5    Q.    Okay.  And you were shown a photograph of
6    marijuana that was found.  Durrell hasn't been
7    charged with possession of marijuana, correct?
8    A.    Not that I'm aware -- I'm not sure what he
9    was charged with, other than the cocaine.
10   Q.    Okay.  To your knowledge --
11   A.    Not that I know of.
12   Q.    Okay.  Are you aware of any evidence that
13   that marijuana belonged to Durrell Bester?
14   A.    I don't know whether there was a discussion
15   as to who the marijuana belonged to.
16   Q.    That's why I'm asking.  If you are aware of
17   any evidence that the marijuana belonged to
18   Mr. Bester?
19   A.    No.
20   Q.    And again, to your knowledge, no
21   fingerprints were taken of --
22           MR. ANDERTON:  Asked and answered, Your
23           Honor.
24           THE COURT:  Sustained.  Anything else?
25   Q.    Y'all found this bag at 1368 5th Place

1  northeast[sic], correct?

2  A.    No.

3  Q.    You're right, I'm sorry.  You found it at --

4  That's Durrell address, correct?

5       No.

6       You found the bag at Ms. Bester's

7  apartment, correct?

8  A.    Yes.

9  Q.    And this was not the apartment -- the

10  apartment was not where y'all were trying to get a

11  search warrant?

12  A.    That's correct.  It was not the place where

13  we had the search warrant.  We already had the

14  search warrant.

15  Q.    Were you there when the search warrant was

16  executed on Mr. Bester's home, residence?

17  A.    No, I couldn't be in two places at the same

18  time, no.

19  Q.    Okay?

20         MR. BENSON:  That's all I have.

21            REDIRECT EXAMINATION

22  BY MR. ANDERTON:

23  Q.    Was there anybody else in the house at the

24  time that you made entry with Ms. Bester?

25  A.    No.

1   Q.    Okay.  Thank you.

2           MR. ANDERTON:  That's ail.

3           MR. BENSON:  No questions.

4           THE COURT:  Any questions for Sergeant

5   French?  Yes, sir?

6           A JUROR:  You said they took two bags

7   in and you said he brought a bag out.  Did

8   he bring the bag out or what --

9           THE WITNESS:  no, I did not say he

10   brought -- -

11          THE COURT:  Okay.  Wait, wait, wait.

12   Wait.

13       We ask a question, then I approve it

14   before we answer it, okay.  You didn't know

15   that.

16          THE WITNESS:  No, I didn't.  I'm sorry.

17          THE COURT:  Did you understand his

18   question?

19          THE WITNESS:  He said, I said they

20   brought -- he took two bags in and brought

21   one bag out.

22          A JUROR:  No, I mean to say, the white

23   guy brought one bag in and he brought one

24   bag in.  I think, didn't you say he took his

25   bag back out.  He brought the bag back out.

1     THE COURT:  Okay.  That's the question.
2   Did you say?  Did you say that?
3     THE WITNESS:  No.
4     THE COURT:  Okay, she said no.
5     Yes, sir?
6     A JUROR:  My understanding of that, the
7   same question.  Both Mr. Bester and his
8   friend were both taking white bags into the
9   house.
10     THE COURT:  Is that correct?  Is the
11   question.
12     A JUROR:  Into the apartment, I'm
13   sorry, not the house.
14     THE COURT:  Okay.
15     THE WITNESS:  That is correct.
16     THE COURT:  Okay.
17     Yes, sir?
18     A JUROR:  It seems as though before you
19   said they were different types of bags.  One
20   was like a Wal-Mart plastic bag and one was
21   a white garbage bag; is that correct?
22     THE WITNESS:  That's correct.
23     A JUROR:  Okay.  And can I ask one more
24   then?
25     The white garbage bag, did that look

```
 1        like the white garbage bag that you found in
 2        the apartment?
 3                THE COURT:  You can answer --
 4                A JUROR:  The white garbage bag that
 5        the white male brought in, did that look
 6        like the white garbage bag that you found at
 7        the apartment that had this Pyrex jar --
 8                THE WITNESS:  The white garbage that
 9        the white male carried in was the larger one
10        that was sitting in the floor.
11                A JUROR:  Right.
12                THE WITNESS:  That had the Pyrex dish
13        and the other stuff.
14                THE COURT:  Okay.
15                Anyone else?
16                    (No response.)
17                THE COURT:  Any follow-up by the State?
18                MR. ANDERTON:  None, Your Honor.
19                THE COURT:  Any follow-up by the
20        defense?
21                MR. BENSON:  I would.  Just one
22        question on the bag.
23                         RECROSS-EXAMINATION
24   BY MR. BENSON:
25   Q.   I thought you testified during my
```

1    questioning, that the garbage bag that the white
2    male brought in contained clothes and an
3    electronic game?

4    A.    No, no.

5          The electronic game was by itself.  He came
6    back and got the electronic game.

7          The bag that had the Pyrex, and some tennis
8    shoes, and some clothing was in it as well.  It
9    didn't just have the Pyrex dish and the scales in
10   it.  It also had tennis shoes and there was some
11   shirts and stuff in there.

12         In the big garbage bag you're talking about,
13   in the big white one --

14   Q.    Right?

15   A.    -- that was sitting in the floor?

16   Q.    Right?

17   A.    It had other items other than what we
18   collected.

19   Q.    Okay.  And, again, there's nothing real
20   distinctive about this white garbage bag, it would
21   be like a typical white garbage bag?

22   A.    Nothing.  It's just like it is in the
23   picture.

24   Q.    Okay.

25   A.    It's the same one as in the picture.

1  Q.    Okay.  And so it's possible it was there

2  prior to the white male carrying in a white

3  garbage bag?

4        You don't necessarily know that that's the

5  same --

6  A.    Well, it had his shoes and clothes in it.

7  Q.    Okay.

8  A.    He was moving -- He was moving, he got put

9  out or whatever the situation was.

10       So the mom said, "This is what they

11 brought."

12 Q.    Okay.

13       THE COURT:  All right.  Anything --

14       Mike go ahead.

15           FURTHER DIRECT EXAMINATION

16 BY MR. ANDERTON:

17 Q.    And the mom told you that the bag that

18 Bester brought in, is the one that he put behind

19 the stereo, or the radio; is that right?

20 A.    She did.

21 Q.    She said that?

22 A.    She said that.

23 Q.    Okay.

24           MR. ANDERTON:  Nothing further.

25           MR. BENSON:  Nothing further.

1          THE COURT:  Yes, sir?

2          A JUROR:  It was the bag that was

3    behind the stereo, the bag that allegedly --

4    that had the cocaine; can I ask that

5    question?  That cocaine was found in?  Or

6    was it the other bag?

7          THE COURT:  You can answer it.

8          THE WITNESS:  It was the bag that was

9    behind the stereo that had the cocaine it

10   in.

11         THE COURT:  Anyone else?

12              (No response.)

13         THE COURT:  All right.

14   Anything else for the State?

15   MR. ANDERTON:  No, Your Honor.

16         THE COURT:  Or the defense?

17   MR. BENSON:  No, Your Honor.

18         THE COURT:  All right.  You're excused.

19              (Witness release.)

20         THE COURT:  Ladies and gentlemen,

21   believe it or not, we are going to break for

22   lunch.

23         And I want to apologize.  I thought we

24   would be at this point by 12:30, and

25   evidently it took us a little longer, so I

1    apologize.

2        I need you to be back at 2:15. 2:15,

3    okay?

4        And remember, not to discuss the case.

5    Don't go to any address that you have seen

6    to make an observation, because there's no

7    guarantee even that it would be in the same

8    condition as it was last year. And it is

9    improper. Don't allow anyone to discuss the

10   case with you.

11       Yes, sir?

12       A JUROR: I just want to get this

13   clear, I think I understand, but I just want

14   to make sure.

15       We can't talk about anything that we've

16   seen amongst ourselves?

17       THE COURT: No, no.

18       A JUROR: We have to wait to deliberate

19   to do that?

20       THE COURT: Exactly.

21       A JUROR: Okay, just making sure.

22       THE COURT: If you go to lunch

23   together, don't discuss the case. Talk

24   about the blow out last night.

25       But don't discuss the case.

```
 1              Any questions?
 2              Okay.  Y'all familiar with eateries
 3         around here?
 4              Very good then.
 5              All right.  Everybody else remain
 6         seated while the jury leaves out.
 7              Have a good lunch.
 8              (Break for lunch.)
 9              THE COURT:  I hope you had a good
10         lunch, ladies and gentlemen.
11              We are going to pick up and continue
12         with the State's case.  And I'll ask the
13         State to call their next witness.
14              MR. ANDERTON:  The State calls Deputy
15         Gast.  G-A-S-T.
16                   DEPUTY AARON GAST,
17              A witness for the State,
18         Was duly sworn and testified as follows:
19              THE COURT:  Have a seat, get
20         comfortable, scoot you towards the mic,
21         watch your knees down there.
22                   (Witness complies.)
23                   DIRECT EXAMINATION
24    BY MR. ANDERTON:
25    Q.    Tell us your name, please.
```

1    A.    Deputy Aaron Gast.

2    Q.    And Mr. Gast -- Deputy Gast, where do you

3    work?

4    A.    I work for Jefferson County Sheriff's Office,

5    Vice and Narcotics.

6    Q.    What do you for them?

7    A.    We mainly work cases that involve people who

8    are selling drugs.

9    Q.    Okay.  How long have you been working with

10   Vice and Narcotics with the Sheriff's Office?

11   A.    I started in February of '08.

12   Q.    Okay.  How long have you been working with

13   the Sheriff's Office total?

14   A.    Let's see five years now.

15   Q.    Okay.  Back in March, March of '08 did you

16   have occasion to be working with the Jefferson

17   County Sheriff's Office, more specifically, March

18   the 24th, 2008?

19   A.    Yes, sir.

20   Q.    All right.  Do you know Hattie French?

21   A.    I do.  She's the supervisor in Narcotics.

22   Q.    All right.  Let me ask you to take a look at

23   State's Exhibit 14.  And ask you if you recognize

24   that particular package, please.

25                   (Witness complies.)

1  A.    I do.

2  Q.    Okay.  And how do you recognize that

3  particular package?

4  A.    I placed the dope in the package and labeled

5  it for the case agent.

6  Q.    All right.  What markings on that -- on the

7  envelope of State's Exhibit 14 are your

8  handwriting?

9  A.    All.  All of the handwriting that I see.

10  Q.    All right.  There is some writing on the

11  very front with a name, address, and that kind of

12  thing, is all that your writing?

13  A.    That's correct.

14  Q.    There is some additional writing on there.

15  Some numbers here (indicating), some writing down

16  there (indicating), it's written in red; is that

17  your handwriting?

18  A.    No, sir.  I believe they did that at the

19  State Tox.

20  Q.    Okay.  Now, when you placed the item -- Did

21  you receive this item from Hattie French?  The

22  dope, itself?

23  A.    I believe so.  I mean, I assume that from,

24  you know, what it says on the package.

25  Q.    Okay.  You filled out that package; is that

1  right?

2  A.     Yes, sir.

3  Q.     All right.  And that package indicates that

4  item was collected by Hattie French?

5  A.     Correct.

6  Q.     All right.  And turned over to you?

7  A.     Correct.

8  Q.     All right.  When you placed the dope into

9  that package, how did you seal up that package?

10 A.     I do it the same way every time.  We start

11 off with a blank envelope that's not sealed, and

12 place contraband inside -- Let me start back, step

13 back.

14        First I'll fill out the information on the

15 blank form -- the blank package, then I'll place

16 the contraband inside, seal it up with evidence

17 tape.  And then I'll initial along the boarders of

18 the evidence tape to insure that it's not

19 compromised.

20 Q.     All right.  Then do you maintain the

21 possession of that particular item?

22 A.     No.  At that point, it's placed into an

23 evidence locker until someone takes it to Tox.

24 Q.     All right.  Do you know Lisa Bartells?

25 A.     I do.

1   Q.     All right.  Does she work in Jefferson

2   County Sheriff's Vice and Narcotics Unit as well?

3   A.     Yes, sir, she does.

4   Q.     All right.

5          Now, there's some writing toward the bottom

6   of that particular envelope on the front, that

7   indicates an individual that took that item to the

8   State Department of Forensic Sciences; is that

9   right?

10  A.     That's correct.

11  Q.     All right.  And who does it say took that

12  item to the State Department of Forensic Sciences?

13  A.     It says from myself to State Tox.  I just --

14  I that's where it was going so I just went ahead

15  and put State Tox.

16  Q.     Okay.  Did you in fact carry that item over

17  to the State Department of Forensic Sciences?

18  A.     No, sir.

19  Q.     Okay.  Who did?

20  A.     I'm not sure, I believe Deputy Bartells.

21  Q.     Okay.

22  A.     Took it.

23  Q.     All right.  From the time that you collected

24  that item from Hattie French, out on the scene,

25  until the time that you sealed it up and turned it

1  into, I think you said an evidence locker --

2  A.    Evidence locker.

3  Q.    Okay.  Was that item in your care, custody

4  and control the entire time?

5  A.    Correct.

6  Q.    Okay.  Did you make any additions or

7  deletions to it?

8  A.    No, sir.

9  Q.    All right.  Was it in the same or

10 substantially the same condition when you turned

11 it over to or when you put it back into the

12 evidence locker as it was when you first received

13 it and sealed it up --

14 A.    Yes, sir.

15 Q.    -- from Hattie French?

16 A.    Yes, sir.

17 Q.    All right.

18        MR. ANDERTON:  I think that's all the

19        questions I have from Deputy Gast, Your

20        Honor.

21        THE COURT:  Cross?

22              CROSS-EXAMINATION

23 BY MR. BENSON:

24 Q.    Real quick, Deputy.  You weren't at the

25 scene of the alleged crime on this incident?

```
 1   A.    We had, if I remember correctly, we had two
 2   different locations.  And I was at one location
 3   while Sergeant French and a few other deputies were
 4   at that in particular location.  So no I was not at
 5   that particular location.
 6            MR. BENSON:  That's all I have.
 7            THE COURT:  All right.  Any questions
 8       for Deputy Gast?
 9                (No response.)
10            THE COURT:  All right.  Then you can
11       step down.  You're excused.
12                (Witness is released.)
13            THE COURT:  Call your next witness.
14            MR. ANDERTON:  Yes sir.  The State
15       calls Lisa Bartells.
16            DEPUTY LISA ANN BARTELLS,
17            A witness for the State,
18       Was duly sworn and testified as follows:
19            THE COURT:  Have a seat, get
20       comfortable, scoot up towards the
21       microphone, and watch your knees down there.
22                (Witness complies.)
23            THE COURT:  State your full name for
24       the record, please.
25            THE WITNESS:  Lisa Ann Bartells.
```

1        DIRECT EXAMINATION

2    BY MR. ANDERTON:

3    Q.    Ms. Bartells, where do you work?

4    A.    I work for Jefferson County Sheriff's

5    Department, Narcotics Unit.

6    Q.    Okay.  And what do you do for them?

7    A.    I'm an investigator.  I investigate narcotics

8    cases and complaints.

9    Q.    Okay.  How long have you been working with

10   the Narcotics Unit?

11   A.    Since September of '07.

12   Q.    Okay.  And how long have you been with the

13   Sheriff's Office total?

14   A.    Since June of 2001.

15   Q.    Ms. Bartells, what are -- Well, let me show

16   you a package.

17         Let me show you that package.  State's

18   Exhibit No. 14.  Do you recognize that package at

19   all?

20              (Witness reviews package.)

21   A.    Yes.

22   Q.    Okay.  What is that, please?

23   A.    What's in it or what is the actual --

24   Q.    Well, what is State's Exhibit 14?

25   A.    It's going to be drug evidence that is in an

```
 1   evidence envelope.
 2   Q.    Okay.  And do you recognize the writing on
 3   that envelope?
 4   A.    Yes, sir.
 5   Q.    And whose writing would that be?
 6   A.    It appears to be Aaron Gast's.
 7   Q.    Okay.
 8   A.    His first name I think it's Lienell.
 9   Q.    Okay.
10   A.    We call him Aaron.
11   Q.    Okay.  And that would be the "A" in the
12   middle of that set of initials; is that right?
13   "L-A-G"?
14   A.    Yes, sir.
15   Q.    Okay.
16         Now, Ms. Bartells, pursuant to your duties
17   working with the Vice/Narcotics Unit, did you
18   carry that particular item over to the State
19   Department of Forensics Sciences?
20   A.    Yes.
21   Q.    All right.  And between the -- Where did you
22   pick that item up from, if you recall?
23   A.    I don't recall who gave me the package.  We
24   periodically go to Tox, and just as we're going or
25   leaving to go over there, we ask everyone if they
```

1  -- everyone in the unit, if they have anything that

2  needs to go to Tox.  And usually several people

3  give the individual that's going their evidence.

4  Q.    Okay.  When you received that item, was it

5  in a sealed condition?

6  A.    Yes, sir.

7  Q.    All right.  And if someone were to hand you

8  an item over there in the Vice/Narcotics Unit that

9  was not in a properly sealed condition, what would

10  you do?

11  A.    I wouldn't take it.  I would --

12  Q.    Why not?

13  A.    I would tell them that they needed to seal it

14  properly.

15  Q.    Why?

16  A.    Because that would break the chain of

17  evidence, obviously.  And so that it can show that

18  it has not been tampered with prior to going over

19  to the Tox Lab.

20  Q.    Okay.  And you in fact carried that item

21  over to the State Department of Forensic Sciences?

22  A.    Yes, sir.

23  Q.    Do you recall when you did that?

24  A.    I don't recall.  I did look at the piece of

25  paper --

1   Q.     Okay.

2   A.     -- that showed it though.  I believe it says

3   4/14.

4   Q.     Okay.

5   A.     I don't remember the year that was on there.

6   I just looked at the date numbers.

7   Q.     Okay.  All right.

8          Between the time that you collected this

9   item, to the time you turned it into the State

10  Department Forensic Sciences, was that item in

11  your care, custody, and control the entire time?

12  A.     Yes, sir.

13  Q.     All right.  Did you make any additions or

14  deletions to that item from the time you collected

15  it -- from the time you collected it, from other

16  members of the Sheriff's Office and Narcotics

17  Unit, to the time you turned it into the Tox?

18  A.     The only thing I did, and this was once I got

19  to Tox, this is my writing where it says "Vice."

20  Q.     Okay.

21  A.     We have to distinguish what we turn in, as

22  opposed to what patrol turns in or what other

23  departments -- or other entities of the department.

24  Q.     All right.  And do you see any differences

25  on that particular envelope that were not there

1    when you turned it into the State Department of

2    Forensic Sciences?

3    A.    No. I mean, other than what they write on

4    there, no.

5    Q.    Okay.

6    A.    In red is what the Department of Forensic

7    Science, when they -- I don't know what it stands

8    for or anything.  This is what they write on there

9    (pointing), and that's your little tape that they

10   put on there.

11   Q.    That green sticker on the other side?

12   A.    Umm, yellow.  Yellow sticker.

13   Q.    Okay.

14   A.    That's what they put on there at the time I

15   turn it in.

16   Q.    Okay.  And you wrote the word "Vice" on it?

17   A.    That is all I did to it.

18   Q.    Okay.  Did you put any other initials or

19   anything else on it?

20   A.    No, sir.

21   Q.    Okay.  And was it in fact in a sealed

22   condition when you turned it into the State

23   Department of Forensic Sciences?

24   A.    Yes, sir.

25   Q.    All right.  Is it the same or substantially

1    the same condition today as it was when you first

2    turned it into the State Department of Forensic

3    Sciences, with the exceptions that you've already

4    told us about?

5    A.    Other than the fact that it was opened.

6    Q.    When was it opened?

7    A.    I don't know.  I didn't open it, so I don't

8    know.

9    Q.    But when you turned it in it was in a sealed

10   condition?

11   A.    Yes.

12   Q.    Got it.

13              MR. ANDERTON:  That's all I've got.

14              THE COURT:  Cross?

15                    CROSS-EXAMINATION

16   BY MR. BENSON:

17   Q.    Couple of quick questions, Deputy Bartells.

18         I'm not sure I understood you.  Where did

19   you say you got that envelope from?

20   A.    I don't remember who gave it to me.  Not

21   everyone goes to Tox every single day.  We have

22   lockers in which we store this in, in our office.

23   Stored with a key.

24         I had some stuff of my own that I was taking

25   to Tox.  And normally when someone goes we offer,

1  "Hey, do you have something that needs to go to

2  Tox?", to everyone in the Unit that is there at the

3  time.

4      And I don't recall who gave me this package.

5  I just know that it was given to me, by someone,

6  and I took it to Tox.

7  Q.   So you didn't actually go to the evidence

8  locker and retrieve it?

9  A.   No, sir.

10  Q.   Okay.  And one more question.  You weren't

11  at the scene of the alleged crime, correct?  As

12  part of that investigation?

13  A.   At this address, that is on this, to where it

14  was collected.  No, I was not.

15  Q.   All right.

16          MR. BENSON:  That's all I have.

17          MR. ANDERTON:  Nothing.

18          THE COURT:  Any questions for Deputy

19      Bartells?

20              (No response.)

21          THE COURT:  All right.  You may stand

22      down.

23          THE WITNESS:  Thank you, sir.

24              (Witness is released.)

25          THE COURT:  State, call your next

1    witness.

2         MR. ANDERTON:   State calls Shari

3    Kelley.

4              SHARI KELLEY,

5         A witness for the State,

6    Was duly sworn and testified as follows:

7         THE COURT:   Have a seat, get

8    comfortable, scoot up towards the

9    microphone, watch your knees down at the

10   bottom.

11        (Witness complies.)

12        THE COURT:   Would you state your name

13   for the record, please?

14        THE WITNESS:   Shari Kelley.

15            DIRECT EXAMINATION

16   BY MR. ANDERTON:

17   Q.   Ms. Kelley, for purposes of the court

18   reporter would you spell your first and last name,

19   please?

20   A.   S-H-A-R-I.   K-E-L-L-E-Y.

21   Q.   Ms. Kelley, where do you work?

22   A.   With the Alabama Department of Forensic

23   Sciences.

24   Q.   What do you do for them?

25   A.   I am a Lab Tech.

1  Q.     And what does a Lab Tech do?

2  A.     Right now, I currently work in the forensic

3  biology section.  But at the time of this case, I

4  was an evidence technician.

5  Q.     All right.  And as an evidence technician

6  for the State Department of Forensic Sciences,

7  what do you do?

8  A.     You're the custodian of all evidence that

9  enters the lab.

10  Q.     Right.  And do you receive evidence that

11  comes into that lab?

12  A.     Yes, I do.

13  Q.     Okay.  Now, let my direct your attention to

14  April the 14th, 2008 and ask you if you received

15  any evidence from the Jefferson County Sheriff's

16  Office concerning one suspect by the name of

17  Durrell Bester.

18  A.     I did.

19  Q.     All right.  What if anything did you

20  receive?

21  A.     One manilla envelope.

22  Q.     All right.

23         Let me show you what has been marked

24  State's Exhibit 14.  And ask you if you can

25  identify that please.

```
 1              (Witness reviews exhibit.)
 2   A.    Yes, I can.
 3   Q.    What is that?
 4   A.    It's the manilla envelope that I received on
 5   April 14th, 2008.
 6   Q.    Who did you receive that from, please?
 7   A.    I actually received out of our intake locker.
 8   Which was put in there by Deputy L.A. Bartells.
 9   Q.    Tell us how that intake locker works.
10   A.    The officer will come in, the item of
11   evidence is given a computer generated lab number.
12   And then it is locked in a secure evidence locker
13   by the officer.
14   Q.    Okay.  So you don't necessarily receive it
15   in a hand-to-hand exchange?
16   A.    No, I do not.
17   Q.    Okay.  But according to the paper work Lisa
18   Bartells left that at the State Department of
19   Forensic Sciences in a sealed locker; is that
20   correct?
21   A.    Correct.
22   Q.    All right.  What if anything did you do with
23   that item once you received it?
24   A.    When I received it out of the locker, I then
25   locked it in our secure evidence vault.
```

1  Q.    Okay.  And at some point did you turn it
2  over to anyone else?
3  A.    I did.  I retrieved it out of the evidence
4  vault on May 19th of 2008 to give to the scientist.
5  Q.    Okay.  Now, who has a key to this secure
6  vault?
7  A.    It would be the evidence technicians and the
8  laboratory director and assistant laboratory
9  director.
10 Q.    Okay.  And you were one of the evidence
11 technicians at the time?
12 A.    Correct.
13 Q.    All right.  When you received State's
14 Exhibit 14 was it in fact in a sealed condition?
15 A.    Yes, it was.
16 Q.    All right.  And did you at that time place
17 any marks on it?
18 A.    Yes, I did.
19 Q.    What marks did you place on it?
20 A.    Our computer generated lab number.
21 Q.    Okay.  And is that handwritten number or is
22 that the little sticker thing --
23 A.    It is going to be the yellow barcode.
24 Q.    The yellow barcode, okay.
25 A.    Uh-huh.

1  Q.     But you didn't put any handwritten things on

2  that?

3  A.     No, I did not.

4  Q.     Okay.  So the red handwriting on there is

5  from someone else?

6  A.     Correct.

7  Q.     Okay.

8         Once you place this barcode on it, what do

9  you do with it?

10 A.     It's then put in the locker by the officer.

11 Q.     Okay.  All right.  So the officer gets the

12 barcode, puts it on it and then it's locked in the

13 locker.

14 A.     Well, the evidence tech will label the

15 envelope, and then it is placed in the locker by

16 the officer.

17 Q.     Okay.  So I guess, what I'm getting at is

18 State's Exhibit 14, the officer would have come

19 in, somebody would have received it?

20 A.     Uh-huh.

21 Q.     And put the barcode thing on it.  And then

22 the officer would have put it in a locker?

23 A.     Correct.

24 Q.     Okay.  And at some point later, you retrieve

25 that item out of the locker, and secured it in the

1    vault?

2    A.    Correct.

3    Q.    Okay.  And then some time after that, you

4    retrieved it out of the vault and turned it over

5    to the scientists?

6    A.    Correct.

7    Q.    All right.  Between the time that you first

8    receive that item on the 14th of April, 2008 to

9    the time that you pulled it out of the vault, on I

10   believe that's May the 19th?

11   A.    Uh-huh.

12   Q.    . Is that correct?

13   A.    That is correct.

14   Q.    Did you make any additions or deletions to

15   that item?

16   A.    I did not.

17   Q.    Okay.

18         And was it in the same condition when you

19   turned it over to the scientists on May 19th as it

20   was when you first collected it on April the 14th?

21   A.    Yes, it was.

22   Q.    All right.  Did there appear to be any

23   additions or deletions to that item from when you

24   turned it into the scientists on May 19th from the

25   time that you had first collected it on April the

1    14th?

2    A.     No.

3    Q.     Okay.  And that whole time when you turned

4    it over to the scientists, was it in a sealed

5    condition?

6    A.     Yes.

7    Q.     When you first received it, was it in a

8    sealed condition?

9    A.     Yes.

10   Q.     And was that item in the care, custody and

11   control of the Alabama State Department of

12   Forensic Scientists from the time it was first

13   turned in by the detective on the 14th, to the

14   time that it was turned over to the scientists?

15   A.     Yes.

16   Q.     Okay.  Did you perform any analysis on the

17   envelope, State's Exhibit 14 or its contents?

18   A.     No, I did not.

19   Q.     Okay.  You didn't have anything to do with

20   doing that, you just kind of making sure it's

21   secure, and then making sure it gets to where it

22   needs to go?

23   A.     That's correct.

24   Q.     All right.

25          Ms. Kelley, that's all I've got.

1          MR. ANDERTON:   Thank you.

2          THE COURT:   Cross?

3                   CROSS-EXAMINATION

4   BY MR. BENSON:

5   Q.    Do you recall, or to the best of your

6   knowledge, recall any other evidence, other than

7   this bag we've been talking about, coming into the

8   Department on Forensic Sciences, regarding this

9   case?

10  A.    No, I do not.

11  Q.    If there were going to be fingerprint

12  evidence taken, or tested, or other type of

13  forensic, would it come to the Alabama Department

14  of Forensic Sciences?

15  A.    Not for fingerprints, no.

16  Q.    Okay.

17          MR. BENSON:   That's all I have.

18          MR. ANDERTON:   I have nothing further.

19          THE COURT:   Any questions for Ms.

20      Kelley?

21              (No response.)

22          THE COURT:   All right, then, you're

23      excused, Ms. Kelley.

24          THE WITNESS:   Thank you.

25              (Witness is released.)

1        THE COURT:  State, call your next

2    witness.

3        MR. ANDERTON:  State calls Sherry

4    Steel.

5                SHERRY STEEL,

6            A witness for the State,

7    Was duly sworn and testified as follows:

8        THE COURT:  Have a seat, get

9    comfortable, scoot up towards the

10    microphone.  Watch your knees down there.

11            (Witness complies.)

12        THE COURT:  Would you state your name

13    for the record, please?

14        THE WITNESS:  Sherry Steel.

15            DIRECT EXAMINATION

16    BY MR. ANDERTON:

17    Q.    Ms. Steel, where do you work?

18    A.    I work for the Alabama Department of Forensic

19    Sciences.  And I work in the Birmingham Hoover

20    laboratory.

21    Q.    What do you do for the Alabama Department of

22    Forensic Sciences, Ms. Steel?

23    A.    My duties there at the Department of Forensic

24    Sciences are to analyze any types of powders, plant

25    materials, we look at pharmaceutical tablets, and I

1    look at any liquids.  And what I do is I identify
2    any presence of any controlled substance.
3    Q.    All right.  What is your job title, I guess?
4    A.    My job title there is Forensic Scientist.
5    Q.    Okay.  And Ms. Steal, can you tell us what
6    your education, training or background is that
7    qualifies you to be a forensic scientist?
8    A.    I received my Bachelor of Science degree in
9    the area of forensic sciences from the University
10   of Alabama at Birmingham.  And once completing my
11   degree, and being employed with the Department of
12   Forensic Sciences, I underwent a 16 month training
13   program with them.
14        After that program was completed I was sent
15   to D.A. school in Virginia to do some additional
16   training.
17        And our department requires 20 hours of
18   continuing education training each year.
19   Q.    All right.  How long have you been working
20   for the Alabama Department of Forensic Sciences?
21   A.    I've been there 19 years.
22        MR. ANDERTON:  Your Honor, at this time
23        I would like to offer Ms. Steal as an expert
24        in the area of forensic sciences.
25        MR. BENSON:  No objection.

1          THE COURT:  She's in.

2    Q.    Ms. Steel, did you have occasion on May the

3    19th, 2008 to receive some evidence in a case

4    against a subject by the name of Durrell Bester?

5    A.    Yes, I did.

6    Q.    What if anything did you receive?

7    A.    On the 19th of May, I received a manilla

8    envelope from our evidence technician.

9    Q.    Is that Shari Kelley?

10   A.    Yes, that is.

11   Q.    All right.  And let me get you to take a

12   look at State's Exhibit 14.  And ask you to take a

13   look at that, and see if you recognize State's 14.

14               (Witness complies.)

15   A.    Yes, I do.

16   Q.    What is State's 14?

17   A.    State's 14 is the envelope which received

18   from our evidence technician.  Which contains an

19   identifier that we place on here when we take in

20   evidence at our lab.

21   Q.    All right.  Now, when you received the item

22   in State's 14, what if anything -- first of all,

23   was it in a sealed condition?

24   A.    Yes, it was.

25   Q.    All right.  And when you first received the

1  envelope marked State's 14, what if anything did

2  you do with that envelope?

3  A.     When I received the envelope and take it into

4  my possession or custody, I place my initials on

5  the identifier that we place on here, when I

6  receive it.  And I also place the case number and

7  my initials and item number on the backside of the

8  envelope.

9  Q.     Why do you do that?

10  A.     I do that so I will recognize it, and it's

11  part of our standard operating procedures that we

12  make a some type of identifier on it, that's

13  personal and known to us, that that evidence has

14  been in our custody.

15  Q.     All right.  Now, Ms. Steel, did you in fact

16  open the envelope marked State's 14?

17  A.     Yes, I did open it.

18  Q.     All right.  And when you opened it, what if

19  anything did you find?

20  A.     When I opened the envelope, I found a plastic

21  bag -- actually two different plastic bags.  In

22  each plastic bag that I opened they contained some

23  powders and compressed material.

24  Q.     All right.  You say plastic bags, what type

25  of plastic bags were they?

1   A.    On the Item A I wrote down that this was a

2   zip-lock bag.

3   Q.    Okay.

4   A.    And what I did because they were in separate

5   bags, I did sub-itemize them.  I have an Item A and

6   an Item B, and it was also a plastic zip-lock bag.

7   Q.    Okay.  Similar to like sandwich bags?

8   A.    Yes, sir.

9   Q.    Okay.  Did you perform any examination or

10  tests on the contents of this powder and this

11  compressed material, A and B?

12  A.    Yes, sir, I did.

13  Q.    What, if any kind of tests, did you perform?

14  A.    On Items A and B, I performed - and this is

15  on each one of the items - the crystal test on both

16  items.  And also some of the individual particles

17  within each bag of the compressed material and the

18  powder.  And the crystal test is where I actually

19  just look at presence of any type of crystal

20  formation when I add a chemical to that actual

21  powder, and that compressed material.

22       After that was done, I take samples from

23  each bag.  And I expose it two other tests.  And

24  one of them is an infared spectrometer.  And that

25  test we'll actually be placing some of our raw

1  sample on there.  It's not extracted or nothing is
2  done to it chemically.  But I look at the exact
3  sample, and it will give me the chemical make-up or
4  formal of what the material contains.

5       The next thing I did was a test that we run
6  on the gas chromatographer.  And that test allows
7  me to actually see a break down of the chemical as
8  it comes on the instrument where it is introduced
9  as a gas.  So it is broken down and it actually
10 will pull fragments out of the sample, and again
11 give us a print out of what is inside that
12 material.

13 Q.    Now, you mentioned that you performed each
14 one of these tests, at any point during your
15 examination do you weigh the material?

16 A.    Yes, sir, I did.

17 Q.    When do you weigh that material in the
18 process?

19 A.    I take a weight of my material when I first
20 take it out of the envelope, before I do any type
21 of testing on it.

22 Q.    Okay.  And why is that?

23 A.    That's just part of our standard procedure,
24 too.  That we just always take a weight of our
25 material before we take anything from it, so we

1  will get an actual weight of what it weighed when
2  it came into the laboratory.
3  Q.    Okay.  And do you weight it -- would you
4  have weighed this in each one of these separate
5  plastic bags?  Or would you have removed those
6  items from the bags themselves?
7  A.    I remove the items from the bag.
8  Q.    Okay.  And that's just to ensure that the
9  weight of the bag itself is not included; is that
10  right?
11  A.    Yes, sir, that's correct.
12  Q.    Now, you mentioned that you do -- and Ms.
13  Steel, I'm going to mess this up, I know -- You do
14  some kind of chemical test with it, all right, on
15  the -- the crystal test?
16  A.    (Nodding head affirmatively.)
17  Q.    All right.  In the performance of the
18  crystal test, you said you tested - for lack of a
19  better term, for reference purposes - bag A and
20  bag B of materials; is that right?
21  A.    Yes, sir.
22  Q.    Okay.  The crystal test, does that in fact
23  destroy some of the material that you use for the
24  purposes of your examination?
25  A.    That particular test does, yes.

1  Q.     Okay.  How much does it take -- I mean, how

2  much does it destroy?

3  A.     Very little of that material.  I take

4  probably, a pen drop, maybe.

5  Q.     Okay.

6  A.     Of my substances.  A very small amount of

7  material that I need to actually do my crystal

8  test.

9  Q.     Okay.  And you did that on the contents of

10 Bag A and the contents of Bag B?

11 A.     Yes, that's correct.

12 Q.     Okay.  And what if anything were the results

13 of the crystal test on the contents of Bag A?

14 A.     My results were positive for the presence of

15 cocaine on Bag A.

16 Q.     And Bag B?

17 A.     My results were also positive for the

18 presence of cocaine.

19 Q.     Now, you mentioned then that you did a

20 spectrometry test; is that right?

21 A.     Yes, I did.  What we call --

22 Q.     Infrared?

23 A.     -- infrared, yes.

24 Q.     Okay.  And does the infrared spectrometry

25 test destroy any of the material?

1    A.    No, it does not.

2    Q.    Okay.  What were the -- How does that work?

3    How does that infrared light actually tell you

4    anything?

5    A.    What it does is the molecule, or the chemical

6    that we're looking at, it will take that light as

7    it hits that chemical, and it will actually give us

8    a print out of a read-out based on how that

9    chemical is made up or the structure of that

10   chemical.

11        So it makes it more like a fingerprint

12   identifier of that chemical.  Because of the way it

13   does -- the way the light handles the bonds and the

14   make-up of the particular substance, that it's

15   identifying as it scans it on the instrument.

16        We place it on there and we allow it to scan

17   that instrument -- or on the instrument it will

18   scan a sample, and that sample will react certain

19   ways based on how that chemical is bonded.

20        And then it will give us like a picture of

21   that particular chemical.

22   Q.    Okay.  But -- and that particular test

23   doesn't destroy any of the material?

24   A.    No, it does not.

25   Q.    But it does give you some type of a result;

1  is that right?

2  A.    Yes, it does.

3  Q.    What was the result of the infrared

4  spectrometry?

5  A.    Again, that the substance did contain

6  cocaine.

7  Q.    Okay.  Finally, you mentioned a gas

8  chromatograph?

9  A.    Yes, sir.

10  Q.    Is that right?

11  A.    Yes.

12  Q.    What is that test, I mean, how does that

13  test work?

14  A.    The gas chromatography or gas chromatograph

15  is the instrument, the chromatography is what we

16  look at as that particular material is introduced

17  into the machine.  It's heated, but it's introduced

18  in there as a gas.

19       So what we do, is we place the sample and

20  the liquid where it dissolves in, and it's allowed

21  to go through the machine it's injected in.

22       And what it does is, it vaporizes and goes

23  in as a gas.  And once it goes in, it has a

24  particular point where it comes out on the

25  instrument that lets you know what that chemical

1  was.  And it's based on standards that we have,

2  recognized standards that we go by to identify our

3  substances with.

4       Once it passes through the gas chromatograph

5  it goes through a mass spectrophotometer.  And that

6  particular instrument will fragment that sample,

7  and give us a pattern, and then based on the

8  temperature in which it comes out of the machine

9  and actually the size of the sample, and how it's

10  chemically bonded and made up, based on those

11  particular things.  Those things will give us a

12  specific identifier based on the library of

13  standards that we have, that will actually identify

14  that sample.

15  Q.    Okay.  And what was the result from the gas

16  chromatography?

17  A.    That that particular substance did contain

18  cocaine.

19  Q.    All right.  Did you perform any other

20  examinations on this material that was given to

21  you.

22  A.    No, I did not.

23  Q.    Okay.  Did you do the gas chromatography on

24  both Bag A and Bag B?

25  A.    Yes, sir, I did.

1  Q.    Okay.  And did both samples indicate the

2  presence of cocaine?

3  A.    Yes, sir, it did.

4  Q.    Both samples indicated the presence of

5  cocaine, with the infrared spectometry as well; is

6  that correct?

7  A.    Yes, sir

8  Q.    Okay.  And the same thing with the crystal

9  test?

10 A.    Yes, sir.

11 Q.    Okay.  So did you do any more tests, besides

12 those three tests?

13 A.    No, sir.

14 Q.    Okay.  Ms. Steel, based on your training,

15 education and background, based on your

16 examination of the material presented to you in

17 this particular cause; have you had a chance to

18 form an opinion as to what the material is that

19 was presented to you in this particular case,

20 against Durrell Bester?

21 A.    Yes, sir, I did.

22 Q.    What is that opinion, please?

23 A.    That the material did contain cocaine.

24 Q.    All right.

25       You indicated that you in fact weighed each

1   one of those bags; is that right?

2   A.     Yes, sir, that's correct.

3   Q.     All right.  Can you tell us the weight of

4   bag -- what you call Bag A?

5   A.     Bag A weighed 43.5 grams.

6   Q.     Okay.  What about Bag B?

7                     (Writing on board.)

8   A.     Bag B weighed 26.1 grams.

9   Q.     Did you in fact add those two weights

10  together to come up with a total weight?

11  A.     Yes, sir, I did.

12  Q.     What did you come up with, please?

13  A.     69.6 grams.

14  Q.     Are you familiar with the term "crack

15  cocaine"?

16  A.     Yes, sir, I am.

17  Q.     What is crack cocaine?

18  A.     Crack cocaine is another form of cocaine.

19  Cocaine is mixed in two forms, either crack cocaine

20  or cocaine base, or cocaine hydrochloride.  Once

21  you have crack cocaine it's usually made or formed

22  from cocaine hydrochloride.

23       This is two different forms of cocaine, one

24  form is smokable, and one is injectable.

25  Q.     Okay.  Was crack cocaine involved in either

1    Bag A or Bag B?

2                    (Witness reviews documents.)

3    A.    Cocaine based or known as "crack cocaine" was

4    involved in Item 1-B, or Bag B.

5    Q.    What about Bag A, what was it?

6    A.    Bag A was cocaine-hydrochloride.

7    Q.    And is was that the powder form?

8    A.    That is the powder form.

9    Q.    All right.

10          Were those the only items you were asked to

11   identify or analyze in this particular case?

12   A.    Yes, sir, it was.

13   Q.    Okay.  Thank you, Ms. Steel.

14          MR. ANDERTON:  That's all the questions

15          --

16          THE COURT:  Cross?

17                    CROSS-EXAMINATION

18   BY MR. BENSON:

19   Q.    Ms. Steel, just real quick.  You simply

20   tested the cocaine that was sent -- that you

21   gathered from -- that Ms. Kelley brought to you,

22   correct?

23   A.    That is correct.

24   Q.    You didn't have anything to do with the

25   investigation?

```
 1   A.     No, sir, I did not.
 2              MR. BENSON:  That's all I have.
 3              THE COURT:  All right.  Any questions
 4         for, Ms. Steel?
 5                 (No response.)
 6              THE COURT:  Very good then.  You are
 7         excused --
 8              MR. ANDERTON:  I'm sorry.
 9                 REDIRECT EXAMINATION
10   BY MR. ANDERTON:
11   Q.     From the time you received the cocaine, to
12   the time you finished your test, and turned it
13   back into the Jefferson County Sheriff's
14   Department, was that item in your care, custody,
15   and control the entire time?
16   A.     It was in my custody, care, and control until
17   I returned it to Ms. Kelley.  And she does the
18   returning to the Jefferson County Sheriff's
19   Department.
20   Q.     Okay.  And you didn't make any additions or
21   deletions to those items, Bag A or Bag B, with the
22   exception of whatever you needed to do in order to
23   perform your examinations; is that correct?
24   A.     Yes, sir.  That's correct.
25   Q.     All right.  It was in the same or
```

1  substantially the same condition when you turned

2  it into Ms. Kelly, and you had finished all of

3  your examinations, as it was when you first

4  received it, with the exception of whatever you

5  needed to do to perform your examination?

6  A.    Yes, that is correct.

7  Q.    All right?

8         MR. ANDERTON:  State would move to

9      introduce State's Exhibit 14, at this time.

10         MR. BENSON:  No objection.

11         THE COURT:  14 is in.

12             (Whereupon, State's Exhibit Number

13             14 was received into evidence.)

14         THE COURT:  Anything else?

15         MR. ANDERTON:  No, sir.

16         THE COURT:  All right.  You're excused.

17             (Witness is released.)

18         MR. ANDERTON:  Judge at this time, the

19      State also move to introduce photographs

20      number 1 and number 10.

21         THE COURT:  Let me see 1.

22         MR. ANDERTON:  Yes, sir.

23             (Whereupon, the Court reviews the

24             exhibit.)

25         THE COURT:  Okay.  1 is in.

1              (Whereupon, State's Exhibit Number
2              1 was received into evidence.)
3          MR. ANDERTON:  All right.
4          State would move to introduce 12 and
5      13.
6          THE COURT:  All right, 12 is in.  And 1
7      through 15 are in.
8              (Whereupon, State's Exhibit
9              Numbers 12 and 13 were received
10             into evidence.)
11         MR. BENSON:  Judge, could we revisit
12     14, I spoke to soon on stating no objection
13     on 14.
14         THE COURT:  I'll hear you.
15             (Off the record side bar.)
16         THE COURT:  Overruled.
17         What says the State?
18         MR. ANDERTON:  Your Honor, may I have
19     just one moment?
20         THE COURT:  Sure.
21             (Off the record.)
22         MR. ANDERTON:  State of Alabama would
23     rest.
24         THE COURT:  All right.  Ladies and
25     gentlemen, allow me take up a legal matter

1     with the lawyers.  And don't discuss the

2     case.  And I'll get back with y'all as soon

3     as possible and we'll continue, okay.  We're

4     moving right along.

5                    (Whereupon, the jury leaves the

6                    courtroom.)

7          THE COURT:  Go ahead, Billy.

8          MR. BENSON:  Judge, at this time, I

9     want to renew on the record my objection to

10    the admission of State's Exhibit 14.  My

11    recollection of the testimony was that

12    Deputy Gast, was that he placed the envelope

13    into an evidence locker and did not have any

14    further dealings with that evidence.  And

15    then Deputy Bartells testified that she did

16    retrieve it from an evidence locker, but was

17    given the evidence.

18         So I would move to suppress that

19    evidence on the basis of a break in the

20    chain of custody.

21         THE COURT:  Response?

22         MR. ANDERTON:  Judge, I would submit to

23    the Court that even if, even if the way

24    Mr. Benson recalls the testimony, is an

25    accurate representation, I would submit to

1    the Court that perhaps that weakens the

2    chain of custody on this case, but it does

3    not break the chain.

4         And of course, the Court is fully aware

5    that a break in the chain of custody, and

6    even a weak link in the chain of custody,

7    does not make a piece of evidence

8    inadmissible, rather it goes to its

9    credibility that the jury -- the jury can

10   give it whatever credibility it wants to.

11   And use it for whatever strength of evidence

12   that it may.  And so I would submit to the

13   Court that State's Exhibit 14 was properly

14   admitted.

15        THE COURT:  All right.  14 is in.

16   Motion denied.

17        MR. BENSON:  Judge, at this time, I

18   would on behalf of my client make a motion

19   for judgement of acquittal.

20        The State has failed to reach its

21   burden in this case.  They have not proved

22   the actual or constructive possession.  And

23   that's the main element of this crime.

24   Which the State has failed to prove that.

25        THE COURT:  All right.  Motion will be

1    denied at this time.

2         Would you like a moment or two to --

3         MR. BENSON:  Yes, sir.

4         MR. ANDERTON:  May I mention something

5    before we do that?

6         THE COURT:  Sure.

7         MR. ANDERTON:  If Mr. Benson is going

8    to present evidence, as he seemed to

9    indicate, and obviously it's up to him and

10   his strategy and change as he sees it fit.

11        If he is going to present evidence of

12   Ms. Dorothy Bester that she did not say some

13   of the things that have been testified to,

14   or that she did not make the statement to

15   the police that she said those things.

16        Then I would suggest to the Court, or I

17   would move that we find counsel to represent

18   her.  It would certainly be a reasonable

19   inference, Your Honor, that if Ms. Bester

20   comes in here and says my son did not put

21   that cocaine there, and I never told the

22   police that.  It would in fact -- could be

23   attributed to Ms. Bester herself.

24        So I would, if Ms. Bester is going

25   testify in that manner.

1          I would ask the Court that she be

2      provided counsel so that she could be

3      properly advised as to the right not to

4      incriminate herself.

5          MR. BENSON:  If I may, Your Honor?

6          THE COURT:  Response?

7          MR. BENSON:  Should I put Ms. Bester on

8      the stand, there will be additional

9      testimony of other individuals, not just

10     herself, and Durrell and the white male,

11     having been in that apartment.

12         THE COURT:  All right.  Well, let's see

13     where we go.  And if I see it is necessary

14     I'll consider that.

15         MR. ANDERTON:  Yes, sir.

16             (Break)

17             (Jury back)

18         THE COURT:  All right.  Let the record

19     reflect the Defendant is present, all

20     counsel are present.

21         Ladies and gentlemen, the State has

22     rested their case.  So now we turn to the

23     defense and we ask the defense to call their

24     first witness.

25         MR. BENSON:  The defense calls Dorothy

```
 1        Bester.
 2                    DOROTHY BESTER,
 3              A witness for the defense,
 4        Was duly sworn and testified as follows:
 5              THE COURT:  Have a seat.  Get
 6        comfortable, do watch your knees down there.
 7                    (Witness complies.)
 8              THE COURT:  Go ahead.
 9                    DIRECT EXAMINATION
10   BY MR. BENSON:
11   Q.    Good afternoon, Ms. Bester.
12         For the record, would you go ahead and
13   state your full name, please, and spell it?
14   A.    Dorothy Conwell Bester.  D-O-R-O-T-H-Y.
15   C-O-N-W-E-L-L.  B-E-S-T-E-R.
16   Q.    Ms. Bester, you know Durrell, correct?
17   A.    Right.
18   Q.    How do you know Durrell?
19   A.    That's my son.
20   Q.    That's your son.  And you just took an oath,
21   correct?
22   A.    (Nodding head affirmatively.)
23   Q.    Just because it's your son sitting here, you
24   wouldn't lie, would you?
25   A.    No, I wouldn't.
```

1   Q.    Okay.  You know why we're here.  Your son

2   has been charged with a crime, specifically,

3   trafficking in cocaine.  That they found allegedly

4   at your apartment.

5   A.    Yes.

6   Q.    Okay.

7         And that happened on March 24th, 2008 do

8   you recall that day?

9   A.    Yes.

10  Q.    Okay.  Before we get into that, I know

11  you're nervous.  You don't do this -- this isn't

12  part of your daily routine or job, you know, I

13  understand your nervous.

14  A.    Yeah.

15  Q.    Nobody's gonna bite you.

16  A.    Yeah.

17  Q.    If he tries I'll tackle him, and we'll stop

18  him.

19  A.    Okay.

20  Q.    In fact, you suffer from a nervous

21  condition, correct?

22  A.    Yes, I do.

23  Q.    You take medication --

24              THE COURT:  What are you doing?

25              MR. BENSON:  I was --

```
 1              THE COURT:  Ask questions.
 2              MR. BENSON:  Okay.
 3   Q.    The medication you take does not affect your
 4   ability to testify --
 5              THE COURT:  Come over here.  Both of
 6         y'all.
 7   A.    No.
 8                    (Whereupon, a side bar was heard
 9                    off the record.)
10              THE COURT:  Go ahead.
11   Q.    All right.  Excuse me, Ms. Bester.  Why
12   don't you go ahead tell me what happened, what you
13   remember about that day?
14   A.    My son, he had gotten into it with his
15   girlfriend.  And he brought his clothes over to the
16   house.  And so the white guy, he came in too, and
17   brought a bag, and took it into the back.  And put
18   it in the hamper.  In the back of my bedroom.  So
19   Durrell, he was toting his clothes in and I went
20   out there helping him tote his clothes in.
21         And later on, I went to the store.  And I
22   was trying to get on out of the house and go on and
23   do what I had to do.  And I went on to the store.
24   When I came back from the store, a lot of people
25   was standing out there in front of my door.  And
```

1   they started asking me questions, what my name was,
2   and everything, so I told them my name.

3        And I when I opened the door, they started
4   coming on in behind me.  And they told me, say,
5   give me the bag.  Said, I seen him bring the bag
6   in.

7        And I, told them that Durrell was bringing
8   some clothes in, and the white guy he brought a bag
9   and put in the hamper in the room in the back.  So
10  I give them the bag.  And I went on in there and
11  gave them the bag that was in my bedroom.  I looked
12  in the hamper and got the bag.

13       And I followed him because he was taking the
14  a bag in my room and I followed him in there, and
15  seen him put the bag in the hamper.

16                 (Brief pause.)
17  A.    And later on --
18            THE COURT:  Wait until he asks you a
19       question.
20  Q.    Okay.  I'm going to show you what's been
21  marked as State's Exhibit 15.  That's your
22  signature, right?
23  A.    Uh-huh.
24  Q.    Okay.  Do you remember this document?
25  A.    I remember they telling me to sign something.

1   But they didn't tell me why.

2   Q.    Okay.

3   A.    I had signed it, but they didn't read it to

4   me.

5   Q.    Okay.

6   A.    I didn't really know what I was signing,

7   because I was real nervous and everything.  I

8   couldn't really, you know, speak, and say what I

9   wanted to say.

10  Q.    Okay.

11         So when you signed this you didn't know

12  what you were signing?

13  A.    No, I didn't.

14  Q.    Nobody explained to you what you were

15  signing?

16  A.    No, they didn't.

17  Q.    When did you sign it?

18  A.    The same day when they came in there.

19  Q.    Okay.  Was this before or after --

20  A.    That was after they had start searching.

21  Q.    Okay.

22         Ms. Bester do you live -- What's your

23  address?

24  A.    1049 Huffman Road Apartment K.

25  Q.    Apartment -- all right.  On the day of March

```
 1   24th, 2008 is that the same address you have now?
 2   A.    No, that's a different.
 3   Q.    Okay.  That was Apartment E?
 4   A.    Apartment E, yeah.
 5   Q.    Okay.  Did you live there by yourself?
 6   A.    No.  Me and my niece, and her boyfriend.
 7   Q.    Okay.  So there are two other people that
 8   lived there.  Did you ever have visitors come to
 9   the apartment?
10   A.    Sometimes I had visitors, yeah.
11   Q.    Okay.  Did your niece and her boyfriend ever
12   have visitors come to the apartment?
13   A.    Yes.
14   Q.    Okay.  In fact, were their times you weren't
15   there --
16            MR. ANDERTON:  Objection.  Leading.
17   A.    Yes.
18            THE COURT:  Sustained.
19            Don't answer if he objects, until I
20       rule, please.
21            THE WITNESS:  Okay.
22            THE COURT:  Objection sustained.
23            Disregard the last answer please.
24            MR. BENSON:  That's all I have, Your
25       Honor.
```

```
 1              THE COURT:  Cross?

 2                  CROSS-EXAMINATION

 3   BY MR. ANDERTON:

 4   Q.    Ms. Bester, you took the sheriff's office

 5   into that room, didn't you?

 6   A.    Yes.  And give them the bag.

 7   Q.    All right.  Hold on.

 8         All right.  And I think you indicated that

 9   was your signature, right there (indicating)?

10   A.    Yes, it is.

11   Q.    Okay.  And a couple of other people

12   witnessed you, saw you sign it, and they signed

13   right below; is that right?

14   A.    That's right.

15   Q.    And you heard the testimony from Sergeant

16   Hattie French --

17              MR. BENSON:  Your Honor, she hadn't

18         heard the testimony.

19              MR. ANDERTON:  Oh, I'm sorry.  All

20         right.

21              THE COURT:  Objection sustained.

22              MR. ANDERTON:  Let me rephrase, Your

23         Honor.

24   Q.    If a deputy sheriff came in and testified

25   that she read this form to you; would she be
```

1  incorrect?

2  A.     She was incorrect.

3  Q.     Okay --

4  A.     -- because they told me --

5  Q.     Now, she testified that -- if she came in

6  and testified that you took them into that room,

7  she would be correct, there, correct?

8  A.     Yeah, I took them to the room.

9  Q.     Okay.  And if she testified that in fact you

10  signed that form, she would be correct there?

11  A.     Yeah, I signed it.

12  Q.     Is that right?  Okay.

13        And if there was additional testimony that

14  you told the sheriff's office that your son came

15  in and put a bag behind the box; would that be

16  correct?

17  A.     I didn't say he put it back there.

18  Q.     You didn't say that?

19  A.     Huh-uh.

20  Q.     Are you familiar with the area where they

21  found the bag that had the cocaine in it?

22  A.     Yes, I am.

23  Q.     Okay.

24        Let me show you State's Exhibit No. 3,

25  right there.  All right.  And that would be in

1  that room, correct?
2  A.    Right.
3  Q.    That's where they found the cocaine?
4  A.    Yes.
5  Q.    Behind that stereo or boom box or whatever
6  it's called?
7  A.    Yes.
8  Q.    Okay.  And that's just another picture of
9  that same corner; is that right?
10 A.    Right.
11 Q.    And that's the farthest wall from when you
12 walk in; is that right?
13 A.    Yeah.
14 Q.    Okay.  So that would be kind of the back
15 wall?
16 A.    Uh-huh.
17 Q.    Okay.  And that's in fact that's a picture
18 of you that night; is it not?
19 A.    Yeah --
20 Q.    Or that day, excuse me.
21       All right.  And then if you look behind
22 that boom box from the top, you can see the bag,
23 can't you?
24 A.    Right.
25 Q.    Okay.  And that's the bag that the cocaine

```
 1  was found in?
 2  A.    Yes.
 3  Q.    Is that right?
 4        Okay.  And that's in a room that Durrell
 5  had some of his clothes in; is that right?
 6  A.    Yeah.
 7  Q.    Okay.
 8  A.    The clothes that we toted in the house.
 9  Q.    Okay.
10            THE COURT:  I'm sorry.  Clothes that we
11        what?
12            THE WITNESS:  Carried in the house.
13            THE COURT:  Clothes that we carried in
14        the house?
15            THE WITNESS:  Yes, I said I helped him
16        brought some of his clothes in.
17            THE COURT:  Okay.
18  Q.    Did you see a white garbage bag, that the
19  white male brought into the house?
20  A.    Yes.
21  Q.    Okay.  And that -- Let me show you State's
22  No. 8.  Right there (indicating), that's a white
23  garbage bag, and that's right there in Durrell's
24  room?
25  A.    That's my room.
```

1    Q.    I'm sorry?

2    A.    That's my room.

3    Q.    That's your room?

4    A.    Uh-huh.  Durrell didn't stay with me.

5    Q.    Okay.  All right.  But the room - and maybe

6    I said that wrong and I apologize I wasn't trying

7    to confuse you.

8         The room that the cocaine was found in,

9    okay?  Is that your room?

10   A.    Yes, it is.

11   Q.    Okay.  And so the room the cocaine was found

12   in is the same room as that white garbage bag; is

13   that right?

14   A.    Right.

15   Q.    Okay.  And that's the -- inside that garbage

16   bag was that Pyrex, and that set of scales, and

17   all those sandwich bags, right?

18   A.    Right.

19   Q.    Some of Durrell's clothes were inside that

20   garbage bag, too, weren't they?

21   A.    Yeah, they was.

22   Q.    Okay.  Is that the room that you sleep in,

23   or is that an extra room that --

24   A.    That's the room that I was sleeping in.

25   Q.    That's the room that you sleep in.

```
 1        So you're trying to tell this jury -- Well,
 2   did you know the cocaine was there?
 3   A.    I didn't know it was there until I went and
 4   looked in there, looked in there to see what he put
 5   in there.  The dude.  Try to see when he put in
 6   there.
 7   Q.    Okay.  So you didn't look inside that
 8   garbage bag?
 9   A.    No, I didn't.
10   Q.    Okay.  All right.
11        But you knew you knew that Durrell and this
12   white man had come into your house and put a bag
13   behind that box, didn't you?
14   A.    Yeah, I know that guy put it back there.
15   Q.    How do you know that white guy did it?
16   A.    Because I followed him.
17   Q.    Okay.  So you saw him do that?
18   A.    Yes.
19   Q.    Okay.  When the police came over and talked
20   to you, and found that inside the house, did you
21   tell them that Durrell placed a white bag against
22   the back wall of the bedroom?
23   A.    No, I didn't.
24   Q.    You didn't tell them that?
25   A.    Huh-uh.
```

```
 1  Q.    And you didn't tell them that the white bag
 2  that Durrell brought into the house is the one
 3  that he placed behind the boom box?
 4  A.    No, I didn't.
 5  Q.    Okay.
 6  A.    I didn't even say he put no bag back there --
 7  Q.    Did you write out a statement for the
 8  police?
 9  A.    Yes, I wrote out something, but I don't know
10  what it was.
11  Q.    All right.  Is that that statement that you
12  wrote out?  Is that your handwriting?
13  A.    Uh-huh.
14  Q.    Okay.  That's your handwriting?
15  A.    Yes.
16  Q.    Okay.
17              (Whereupon, State's Exhibit Number
18              16 was marked for identification.)
19         MR. BENSON:  May we approach, Judge?
20         THE COURT:  Sure.
21              (Side bar.)
22         THE COURT:  Go ahead.
23  Q.    So let me show you State's Exhibit 16.  Is
24  that the handwritten statement that you gave to
25  the police?
```

1          (Witness reviews document.)

2    A.    Yes, I wrote that because I was nervous --

3    Q.    All right. Would you read what you wrote on

4    the handwritten statement?

5    A.    "My son came home with bags and left and two

6    white guys were with him and he left come in with

7    him the white bag behind the box."

8    Q.    The white bag behind the box?

9    A.    Uh-huh.

10   Q.    All right. And we're talking about the boom

11   box over in that corner, aren't we?

12   A.    Yes.

13   Q.    So you told the police that Durrell came in

14   with the white bag that was found behind the box?

15   Is that right?

16   A.    I told them that --

17   Q.    Okay?

18   A.    -- but I know that white guy put it in there.

19   Q.    Oh, okay. Now --

20   A.    Because I was nervous --

21   Q.    Ma'am, please.

22         I didn't ask any questions.

23   A.    Okay.

24   Q.    Do you recall telling or asking them if you

25   were going to jail?

```
 1  A.    Do I recall asking who?

 2  Q.    The sheriff's office?

 3  A.    (Shaking head no.)

 4  Q.    You don't recall asking them that?

 5  A.    Did I ask them that?

 6  Q.    Yes.  Did you ask them, am I going to jail?

 7  A.    No, I didn't ask them that.

 8  Q.    So if someone were to testify to that, they

 9  would be mistaken?

10  A.    I didn't ask them that.

11  Q.    Okay.  So if somebody testified to that

12  they'd be mistaken?

13  A.    Yep.

14  Q.    Okay.  But if they testified that you told

15  them that Durrell brought in the white bag that

16  was found behind the boom box in there, they'd be

17  correct about that because that's what you told

18  them; isn't that right?

19  A.    I didn't tell them that.  I just wrote it

20  down.

21  Q.    Oh, okay.  You didn't tell them that, you

22  just wrote it down?

23  A.    I just wrote it down, because I was nervous.

24  Q.    You led them into that particular room; did

25  you not?
```

1    A.    Yes, I did.

2    Q.    And you showed them where that white bag

3    was?

4    A.    Yes.  I gave it to them.

5    Q.    Okay.  And given the opportunity to write

6    down the truth, you put it on your son as opposed

7    to the white guy; is that right?

8    A.    Yeah, because I was nervous.  And they was

9    saying that --

10   Q.    You want this jury to believe that?

11   A.    Because they were saying that --

12   Q.    Do you want this jury to believe that?  That

13   you blamed your son when he wasn't guilty?

14   A.    No, I don't.

15   Q.    You don't want them to believe that.

16         Who did you blame that day, Ms. Bester?

17   A.    The white guy.

18   Q.    The white guy --

19   A.    Because he put it behind that red hamper.

20         I just was nervous that day when I wrote

21   that.

22   Q.    He came in with the white bag behind the

23   box.  You told the police, the sheriff's office,

24   that day, that Durrell brought in the bag that was

25   found behind the boom box, didn't you?

```
 1   A.     I wrote it.

 2   Q.     You wrote it?

 3   A.     Uh-huh.

 4          MR. ANDERTON:  Nothing further.

 5          THE COURT:  Any redirect?

 6          MR. BENSON:  No, Your Honor.

 7          THE COURT:  Any questions for Ms.

 8   Bester?

 9              (No response.)

10          THE COURT:  All right, then.  You may

11   stand down.

12              (Witness is released.)

13          THE COURT:  Call your next witness

14   defense.

15          MR. BENSON:  At this time the defense

16   rest.

17          THE COURT:  All right.  Ladies and

18   gentlemen, I need to take care of a matter

19   with the lawyers.  It won't take but

20   probably five minutes, okay.

21          And then I'll bring you back.

22              (Whereupon, the jury leaves the

23              courtroom.)

24          THE COURT:  Billy?

25          MR. BENSON:  Sir?
```

```
 1          THE COURT:  Do you renew your motion
 2     for judgement of acquittal at the conclusion
 3     of all the evidence in the case?
 4          MR. BENSON:  I do, Your Honor.
 5          THE COURT:  All right.  It's denied.
 6          Y'all ready to argue in a few minutes?
 7          MR. BENSON:  If I could have just a
 8     couple minutes with my client, Your Honor?
 9          THE COURT:  Mike?
10          MR. ANDERTON:  During that two minutes,
11     I may have two rebuttal witnesses.
12          Very short rebuttal witnesses.
13          THE COURT:  All right.
14               (Whereupon, the jury returns to
15               the courtroom.)
16          THE COURT:  All right.  Ladies and
17     gentlemen, the defense has rested their
18     case.  And the law allows the State the
19     option to call what we call rebuttal
20     witnesses during the trial.  So the State
21     has advised the Court that they wish to call
22     one or two rebuttal witnesses to rebut some
23     testimony that you have just heard, okay.
24          All right.
25               DEPUTY ROGER MORRIS,
```

```
 1            A rebuttal witness for the State,
 2       Was duly sworn and testified as follows:
 3            THE COURT:  Have a seat, get
 4       comfortable, scoot up towards the microphone
 5       and watch your knees.
 6                 (Witness complies.)
 7                 DIRECT EXAMINATION
 8  BY MR. ANDERTON:
 9  Q.   Tell us your name, please.
10  A.   I'm Roger Morris.
11  Q.   Mr. Morris, where do you work?
12  A.   Jefferson County Sheriff's Office, Narcotics.
13  Q.   What do you do for them?
14  A.   I'm an investigator.
15  Q.   All right.  Is it Deputy Morris?
16  A.   That's correct.
17  Q.   Deputy, let me direct your attention to the
18  24th of March, 2008 did you have occasion to
19  participate in the investigation involving one
20  Durrell Bester?
21  A.   I did.
22  Q.   All right.  And did you come on that
23  occasion to meet a lady by the name of Dorothy
24  Bester?
25  A.   I did.
```

1    Q.    Do you see Ms. Bester in the courtroom

2    today?

3    A.    Yes, I do.

4    Q.    Okay.  Could you point her out and tell me

5    what she is wearing?

6    A.    She's second row back (pointing), wearing a

7    black shirt.  A black sweater.

8    Q.    Okay.

9          MR. ANDERTON:  Let the record reflect

10         that the witness has indicated Ms. Bester.

11   Q.    Now, Mr. Morris, Did you have occasion to

12   talk to Ms. Bester, or be present, when Ms. Bester

13   was talked to bu the Jefferson County Sheriff's

14   Office?

15   A.    Yes.

16   Q.    All right.  And who else was present?

17   A.    Jude Washington was with me.

18   Q.    All right.  During the course of that

19   conversation did you take note concerning that

20   conversation?

21   A.    Yes.

22   Q.    All right.  Have you had a chance to take a

23   look at those notes?

24   A.    I have today.

25   Q.    Okay.  Do you recall whether or not Ms.

1    Bester talked to you about the white bag that was

2    recovered from her house?

3    A.    Yes, sir.

4    Q.    All right.  And do you recall what your

5    notes reflect when it comes to who brought that

6    bag in?

7    A.    She said that her son carried in a white bag.

8    And she also said that there was a, I believe, two

9    white males with him and one of them was possibly

10   carrying a bag with him as well, and she wasn't

11   sure.

12   Q.    All right.  Did she indicate to you,

13   according to your notes, where Durrell Bester

14   placed the white bag that he had?

15   A.    Yes.

16   Q.    Where?

17   A.    On the back wall.

18   Q.    Okay.  And were you present when a white bag

19   was in fact recovered from the back wall?

20   A.    Yes, I was.

21   Q.    Was that behind the boom box?

22   A.    That would be correct.

23   Q.    Okay.

24         And did Ms. Bester, from what you recall,

25   did Ms. Bester led the sheriff's office to that

1  particular white bag?

2  A.    Yes, sir.

3  Q.    Did she indicate to the sheriff's officer,

4  or to you, that Durrell had in fact placed that

5  white bag in that corner behind the boom box?

6  A.    She said Durrell had placed it there.

7  Q.    Okay.  Did she, at any point, tell you about

8  a white male bringing a white bag in and placing

9  it in a hamper.

10  A.    I recall her saying that white male came in

11  and was possibly carrying a white bag, she wasn't

12  sure.  I believe that's what she said to me.

13  Q.    Okay.  But the bag where the cocaine was

14  found, did she identify that as the one that

15  Durrell had?

16  A.    Yes.

17  Q.    Thank you.

18         THE COURT:  Cross?

19         MR. BENSON:  No questions.

20         THE COURT:  All right.  You may -- Do

21     y'all have any questions for Deputy Morris?

22            (No response.)

23         THE COURT:  All right, then.  You're

24     excused.

25         THE WITNESS:  Thank you.

1              (Witness is released.)

2              MR. ANDERTON:  State calls Jude

3         Washington.

4              THE COURT:  Jude Washington.

5              DEPUTY JUDE WASHINGTON,

6         A rebuttal witness for the State,

7         Was duly sworn and testified as follows:

8              THE COURT:  Have a seat, get

9         comfortable, scoot up towards the

10        microphone.  Watch your knees.

11             (Witness complies.)

12                   DIRECT EXAMINATION

13   BY MR. ANDERTON:

14   Q.    Tell us your name, please.

15   A.    Jude Washington.

16   Q.    Mr. Washington, where do you work?

17   A.    Jefferson County Sheriff's Office.

18   Q.    And what do you do for them?

19   A.    Undercover Vice and Narcotics.

20   Q.    How long have you been with the sheriff's

21   office?

22   A.    Since 1995.

23   Q.    All right.  In March on the 24th of '08 were

24   you working you the sheriff's office at that time?

25   A.    Yes, sir.

1  Q.    Did you participate in the investigation of

2  an individual by the name of Durrell Bester?

3  A.    Yes, sir.

4  Q.    All right.  Did you ultimately come to know

5  a lady by the name of Dorothy Bester.

6  A.    Well, I met her.  Yes, sir.

7  Q.    All right.  And was that in fact over at

8  1037 Avenue[sic] E on Huffman Road?

9  A.    The apartment complex was I think was Twin

10 Gates Apartment.

11 Q.    Okay.

12 A.    Yes, sir.

13 Q.    Okay.  Did you have occasion to be present

14 when the sheriff's office talked to Ms. Bester?

15 A.    Yes, sir.

16 Q.    All right.  Did Ms. Bester in fact write out

17 a statement?

18 A.    Yes, sir.

19 Q.    All right.  And let me show you what's been

20 marked State's Exhibit 16.  See if you recognize

21 that particular statement.

22              (Witness reviews document.)

23 A.    Yes, sir.

24 Q.    Is that the statement -- Is that a copy of

25 the statement Ms. Bester wrote out?

1   A.    Yes, sir.

2   Q.    Was that the statement written out by Ms.

3   Bester, in her own handwriting?

4   A.    Yes, sir.

5   Q.    All right.  During the conversation with Ms.

6   Bester, did she tell you that Durrell Bester had

7   brought a white bag into the apartment?

8   A.    Yes, sir.

9   Q.    Did she tell you where she Durrell Bester

10   had placed that white bag?

11   A.    She actually took us to where he put it.

12   Q.    All right.  Did she in fact sign a consent

13   form?

14   A.    Yes, sir.

15   Q.    Before you came in?

16   A.    Yes, sir.

17   Q.    Or before you went into the apartment?

18   A.    Prior to us entering her apartment, she

19   signed the consent form.

20   Q.    Okay.  And did Hattie French in fact read

21   that form to her?

22   A.    Yes, sir.  She read it and explained it to

23   her.

24   Q.    Did Ms. Bester sign it?

25   A.    She signed it.  Yes, sir.

1    Q.     Okay.  And did somebody witness it?

2    A.     I was with Ms. French, I don't know if I

3    witnessed it or somebody else witnessed it.

4    Q.     Okay.  Let me show you State's 15.

5           You know who witnessed it, can you

6    recognize any of that handwriting?

7                      (Witness reviewing document.)

8    A.     No, sir.

9    Q.     Okay.  Now, Deputy Washington, did Ms.

10   Bester tell the Jefferson County Sheriff's Office,

11   while you were there, and did you hear her say

12   that Durrell Bester had placed the white bag

13   against the back wall of the bedroom?

14   A.     Yes, sir.

15   Q.     Okay.  And you say she led y'all straight to

16   that bag?

17   A.     Yes, sir.

18   Q.     Did she at any point ask whether or not she

19   was going to jail?

20   A.     When Sergeant French initially started

21   talking to her about why we were there, and she

22   asked if she mind if we came in the house to look.

23   She asked Sergeant French if she was going to jail.

24   Sergeant French told her that she was not who we

25   were investigating.

1          And she said well come on.  And then
2   Sergeant French to her to hold up for a minute.
3   And had somebody hand her consent form for her to
4   sign.
5   Q.    And Ms. Bester signed that form?
6   A.    Yes, sir.
7   Q.    And then what happened?
8   A.    Then she took us to where she said Durrell
9   placed the bag in the bedroom.
10  Q.    And where was that?
11  A.    It was in a far corner, behind a little
12  radio.  A little stand that was in the corner, it
13  was placed behind that.
14  Q.    State's Exhibit No. 3, do you see where that
15  bag was located in that picture?
16               (Witness reviews document.)
17  A.    Yes, sir.  It would have been behind that
18  stand there?
19  Q.    Behind that stand right there (pointing)?
20  A.    Yes, sir.
21  Q.    All right.  State's Exhibit 4, State's
22  Exhibit 5 do they show that radio?
23               (Witness reviews documents.)
24  A.    Yes, sir.
25  Q.    And does State's 5 show the bag, looking

1   behind that stand?

2   A.    Yes, sir.

3   Q.    All right.  And is that the correct location

4   where that bag, in fact, was located?

5   A.    Yes, sir.

6   Q.    And is that the location that Ms. Bester led

7   the Jefferson County Sheriff's Office to, once she

8   found out she was not going to jail?

9   A.    Yes, sir.

10  Q.    All right.

11            MR. ANDERTON:  That's all.

12            THE COURT:  Cross?

13                   CROSS-EXAMINATION

14  BY MR. BENSON:

15  Q.    Real quick, Deputy Washington.  You

16  indicated that Ms. Bester asked if she was going

17  to jail?

18  A.    Yes, sir.

19  Q.    Why would she make that --

20            MR. ANDERTON:  Objection, Your Honor.

21        Calls for a mental operation.

22            THE COURT:  You said, Ms. Bester asked

23        if she was going to jail.  And then you said

24        something else, "why"?

25            MR. BENSON:  I asked if he had any idea

1   why she would be asking.

2       THE COURT:  Sustained, mental

3   operation.

4       Go ahead.

5       Next question.

6       MR. BENSON:  That's all.

7       MR. ANDERTON: Nothing further.

8       THE COURT:  Any questions for Officer

9   Washington?

10          (No response.)

11      THE COURT:  All right, then.  You're

12  excused, Officer Washington.

13      THE WITNESS:  Yes, sir.

14      THE COURT:  16 is here.  In case

15  anybody wanted it. (Indicating).  I didn't

16  hear it offered.

17      MR. ANDERTON:  State would move to

18  introduce State's 16.

19      THE COURT:  All right.  16 is in.

20          (Whereupon, State's Exhibit Number

21          16 was received into evidence.)

22      THE COURT:  Anything else for the

23  State?

24      MR. ANDERTON:  Nothing, Your Honor.

25  The State would rest.

```
 1              THE COURT:  All right.  State rests.
 2              All right.  Y'all ready to argue,
 3         gentlemen?
 4              MR. ANDERTON:  Yes.
 5              MR. BENSON:  Yes, Your Honor.
 6              THE COURT:  Well, I guess we do need to
 7         have a short conversation.  -
 8              Would y'all go back for a minute and
 9         let me talk to the lawyers for a second?
10                   (Whereupon, the jury leaves the
11                   courtroom)
12              THE COURT:  Your motion is deemed made
13         timely, and it's overruled.
14              MR. BENSON:  Judge, I renew my motion
15         for judgement of acquittal.
16              THE COURT:  Same ruling, denied.  Bring
17         them in.
18                   (Whereupon, the jury returns to
19                   the courtroom.)
20              THE COURT:  All right.  Ladies and
21         gentlemen, you've heard all of the evidence
22         in the case.
23              And now, you are going to hear the
24         closing arguments of the attorneys, okay.
25         So it's your duty to remember the evidence
```

1     the way it came from the witness stand.  The
2     attorneys, in closing arguments, get to
3     review the evidence for you, and they also
4     get to argue reasonable inferences from the
5     law.
6         So since the State has the burden of
7     proof, the State gets to argue their case
8     first and last.  With the defense arguing
9     their case in the middle.
10        So let's turn our attention to the
11    State.  Mike, you have the floor.
12        MR. ANDERTON:  Thank you, Your Honor.
13              (Whereupon, the State presented
14              their closing argument to the
15              jury, there being no objections or
16              exceptions taken thereto.)
17              (Whereupon, the defense presented
18              their closing argument to the
19              jury, there being no objections or
20              exceptions taken thereto.)
21              (Whereupon, the State presented
22              their closing argument to the
23              jury, there being no objections or
24              exceptions taken thereto.)
25        THE COURT:  All right.  Ladies and

1    gentlemen, we are at that part of the trial

2    where it is my duty to instruct you as to

3    the law that you should apply in this case.

4    And I will proceed to do that, at this time.

5        This Defendant, ladies and gentlemen,

6    enters into this trial with the presumption

7    of innocence.  That is, he is enters into

8    the trial with the presumption that he is

9    not guilty.  And that presumption of

10   innocence follows him throughout this trial,

11   until such time as the State can prove

12   beyond a reasonable doubt his guilt.

13       Now, the burden of proof is on the

14   State to convince you, beyond a reasonable

15   doubt of the Defendant's guilt.  The

16   Defendant has no burden of proof.

17       Now, the term reasonable doubt is

18   defining.  It means a doubt that you can

19   give a good, sound, sensible reason for.  It

20   does not mean an imaginary doubt, or a

21   speculative doubt, or a fanciful doubt.  The

22   law contemplates a reasonable doubt.

23       And since this is true, proof beyond a

24   reasonable doubt does not mean to a

25   mathematical certainty.  Because in all

1    probability in cases where we rely upon the

2    testimony of human beings, that would be

3    impossible.  The best way I know how to

4    explain it, is this:

5        If, after a full and fair consideration

6    of all the evidence in the case, there

7    remains in your minds an abiding conviction

8    of the Defendant's guilt, then in that

9    event, of course, you have been convinced to

10   the required degree, and the Defendant

11   should be convicted.

12       If, on the other hand, after that same

13   full and fair consideration of all the

14   evidence in the case, there does not remain

15   in your minds an abiding conviction of the

16   Defendant's guilt; well, of course, in that

17   event you have not been convinced to the

18   required degree, and the Defendant should be

19   acquitted.

20       Now, ladies and gentlemen, I read the

21   indictment and -- two indictments and one

22   complaint to you in the beginning.  And I

23   remind you before you go back into the jury

24   room to begin your deliberations that the

25   indictments and complaints are not evidence.

1    And are not to be considered as evidence

2    against the Defendant.

3        Those documents are the formal means by

4    which defendants in criminal cases are

5    advised of the specific charge or charges

6    against him or her.

7        To these indictments, these charges,

8    these allegations, this Defendant has

9    entered a plea of not guilty.  He says that

10   he is not guilty of the charged offenses.

11   So the indictments and the complaints on the

12   one hand, and his plea of not guilty on the

13   other; those two things come together to

14   make up the issues regarding guilt or

15   innocence that you all are called upon to

16   decide, in this case.  But the indictments

17   and complaints are not evidence.

18       What the attorneys say ladies and

19   gentlemen, is not evidence, in the case.

20   Additionally, as a matter of fact, what the

21   Court says is not evidence.  There is

22   nothing that I have said during the course

23   of presiding over this trial that was

24   intended in any way to try to infer that the

25   Court felt one way or the other concerning

1    the guilt or innocence of this Defendant.

2    The law does not allow me to have an opinion

3    regarding the Defendant's guilt or innocence

4    at this time and I do not.  I have simply

5    been trying to do my best in presiding over

6    this trial.

7        Now, ladies and gentlemen, you are the

8    triers and finders of the facts in this case

9    from the evidence.  And in determining the

10    guilt or innocence of this Defendant, you

11    should not go outside of the evidence that

12    you have heard here from this witness stand.

13    Except the law does say that you should use

14    your good common sense and your life

15    experiences when deliberating in this case.

16    Take that common sense and those life

17    experiences with you back into the jury room

18    during your deliberations and use them.

19        You are the triers and finders of the

20    facts in the case.  And not only that, you

21    are the sole and exclusive judges of the

22    credibility, the believability of the

23    witnesses who have testified in the case.

24    It is your job to determine how much weight,

25    and how much credibility you will give to

1        the witness's testimony.

2            The law says that in judging the

3        credibility of witnesses, you may consider

4        any interest, any bias, any prejudice that's

5        been shown on a part of a witness.  If you

6        believe that it is such that it might cause

7        a witness to tell you something other than

8        the truth.

9            Additionally, you may consider a

10       witness's appearance and demeanor while

11       testifying on the witness stand in

12       determining how much weight and how much

13       credibility you will assign to the witness

14       testimony.

15           So as I mentioned earlier, what you

16       want to do is determine what testimony you

17       find is believable, i.e. credible, okay.

18       And then you take that testimony that you

19       find to be credible, believable, and you ask

20       yourself, you weigh it.  Am I convinced

21       beyond a reasonable doubt of the Defendant's

22       guilt of the charges?  If you are, you

23       convict.  If you are not, you acquit.

24           Now, during the course of the trial

25       there was a witness that was qualified to

1    testify as an expert witness, this is

2    because the law recognizes that certain

3    people because of their education and

4    training, they have special information

5    different than the ordinary lay person.

6        The law allows these people to give

7    answers to hypothetical questions, and to

8    answer questions beyond that of an ordinary

9    lay person.  But the law is clear that you

10   are not duty bound to follow the testimony

11   of an expert.  The law instead urges you to

12   consider expert testimony along with all the

13   other testimony in the case.

14        If you believe, ladies and gentlemen,

15   that any witness has intentionally lied to

16   you concerning a material fact.  Something

17   that's important to the resolution of the

18   case, one way or the other.  Then, the law

19   is clear, you may disregard either all, or

20   any part of that witness's testimony.

21        I'm not talking about the situation

22   where a witness, in an effort to try to tell

23   you the truth, simply makes a mistake.  No,

24   that's not what I speak of.  What I'm

25   speaking of is the situation where the

1   witness intentionally took the stand, with

2   the purpose of lying to you, concerning an

3   important matter.

4        It's just like in everyday life, once a

5   witness lies to you, a person lies to you

6   then you don't readily believe that person

7   as quickly, do we?

8        So the law uses that same sort of

9   common sense logic, and guides you by saying

10  that if you feel that a witness

11  intentionally lied to you concerning a

12  material fact, you may disregard either all

13  or any part of that witness's testimony.

14       So let's turn our attention to the

15  charges that you have to look at, ladies and

16  gentlemen, and you have three of them of

17  course.

18       The first one, is the trafficking in

19  cocaine charge.  Failure to affix tax stamps

20  to that cocaine.  And three, possession of

21  drug paraphernalia.

22       The law says that a person commits the

23  crime of trafficking in cocaine, if he

24  knowingly is in actual or constructive

25  possession of an excess of 28 grams of

1    cocaine.

2         All right.   There are different amounts

3    for different things.   Like for marijuana

4    it's 2.2 pounds, okay.   But this is cocaine.

5    So it's 28 grams is the limit.   Is the

6    dividing line, more accurately.

7         So to convict this Defendant of the

8    offense of trafficking in cocaine, the State

9    must prove the following four elements to

10   you.

11        First, that this Defendant knowingly

12   was in actual or constructive possession.

13        Secondly, of cocaine.   That the

14   substance was cocaine.   That you heard the

15   testimony about.

16        Thirdly, that it was an excess of 28

17   grams.

18        And fourthly, that in doing so the --

19   and "in doing so" meaning being in

20   possession of it, he was -- he acted

21   knowingly.

22        The law says a person acts knowingly

23   with respect to a result or to conduct when

24   he is aware of that conduct, or he is aware

25   that the circumstance exists.   So we're not

1    talking about accidentally being in

2    possession of something.  We're talking

3    about knowing what you're doing basically,

4    okay.

5         We're not talking about a situation

6    like, let's say she has a coat on her lap.

7    Let's say that when she went in the

8    restroom, somebody put 29 grams of cocaine

9    in there.  She came back and put the coat

10   back on her lap.  Well, would she knowingly

11   be in possession of it?  No.  So here we're

12   talking about knowing what you're doing.

13   Knowing conduct.

14        If you find, that the State has proved

15   each one of those four elements and proved

16   them beyond a reasonable doubt, you shall

17   convict the Defendant of trafficking in

18   cocaine; if you find that the State has

19   failed to prove any one or more of those

20   four elements, you shall acquit the

21   Defendant of trafficking in cocaine.

22        Which turns our attention to the second

23   charge of failure to affix a tax stamp.  To

24   establish this crime the State must prove

25   two things.

1      First, that this Defendant possessed a

2  controlled substance.  Such as the cocaine,

3  alleged in the other charge, the initial

4  charge.

5      And secondly, that he possessed it

6  without affixing the proper tax stamps on

7  the controlled substance.

8      So if find that the State has proved

9  both of those two elements that the

10  Defendant possessed the controlled

11  substance, i.e., cocaine.  And that he did

12  so without placing the proper State tax

13  stamp thereto, then you shall convict him.

14  If you find that the State has failed to

15  prove any one or more of those two elements,

16  you shall acquit him.

17      Which brings us to the last charge,

18  possession of drug paraphernalia.

19      Well, let me edify you a little bit.

20  The term "drug paraphernalia" means all

21  equipment products, and materials of any

22  kind which are used, intended for use, or

23  designed for use in planting, propagating,

24  cultivating, growing, harvesting,

25  manufacturing, compounding, converting,

1    producing processing, preparing, testing,

2    analyzing, packaging, repackaging, storing,

3    containing, concealing, injecting,

4    ingesting, inhaling or otherwise introducing

5    into the human body, a controlled substance.

6        So if you use things to do that stuff

7    to introduce drugs into the human body, I

8    think is what they are talking about.

9        To convict, the State must prove two

10   things beyond a reasonable doubt.

11       One, that the Defendant possessed drug

12   paraphernalia, as defined to you here.

13       Secondly, that he used the drug

14   paraphernalia or possessed it with intent to

15   use it in connection with a drug crime.

16       A drug crime would be trafficking.

17   Sale or distribution of drugs, or possession

18   of a lesser amount of drugs.

19       Does that's make sense?

20           (No response.)

21       THE COURT:  You've heard me use the

22   word terms actual possession and

23   constructive possession.

24       Let's say that in my little robe here

25   on the inside pocket, that I had over 28

```
 1    grams of cocaine.  Then, I would be in
 2    actual possession of the cocaine, would I
 3    not?
 4         Okay.
 5         In my chambers, I have a restroom,
 6    okay.
 7         And in that restroom I have a
 8    toothbrush, toothpaste.  Now, that
 9    toothbrush and that toothpaste is not on my
10    person right now, is it?  But, it's what?
11    Within my control.  And it is mine.  I own
12    it.  I bought it.  I intend to possess it.
13    And if someone goes in there and takes it,
14    they still are taking it from me.  Because
15    why?  I am in constructive possession of it.
16         Does that make sense?
17         Give you another example.  There's a
18    jail next door to us.  Sometimes we bring
19    people over here from the jail next door.
20    And the people we bring over here leave
21    items of personal property over there in the
22    jail, while they are coming over here to
23    court.
24         If someone takes their property while
25    they are over here.  They are taking it from
```

1    their, what kind of possession?

2        Constructive possession. They still

3    own it, okay.

4        So that's the thing about constructive

5    possession is that you intend to manifest

6    control other the property. You can have

7    something at home in your refrigerator.

8    It's not on your person actually. But it's

9    within your control. So it's the same sort

10   of thing.

11       Now, I can give y'all a long definition

12   if y'all don't understand that. Okay.

13       There are two types of evidence.

14   There's direct evidence. You know, when a

15   witness says, I saw this, I smelt this, I

16   heard that. Smelled, heard, taste, saw; all

17   of those sensories. That's direct evidence.

18   And you look at it as direct evidence of

19   something.

20       Then there is a circumstantial

21   evidence. Circumstantial evidence is a

22   little harder to describe, but you are very

23   familiar with it, even if you don't know it.

24   Circumstantial evidence has a nice, long,

25   little definition. But it's just a fancy

1  way of saying this.  If you can prove one
2  thing, you can infer another thing from that
3  thing that you proved.
4       For example, in the evenings when I go
5  home and I unwind and I sit on my balcony,
6  at my loft.  I like to drink a glass of
7  Arizona Ice Tea.  And the way that I face is
8  kind of east, and I can see south, and I can
9  see north, and I see the planes come and go.
10  And sometimes I look up there and I see
11  lines in the sky.  And sometimes I look up
12  there and I see jet planes leaving lines in
13  the sky, okay.
14       Now, when I see the jet planes leaving
15  the lines in the sky, the white lines from
16  the jet fuel.  Then I know what left the
17  line there, don't I?  That's actual.
18       But, when I do not see it -- That's
19  actually evidence, direct evidence.  I see
20  the plane leaving the smoke line.  But when
21  I don't see the plane, but I still see those
22  lines.  I still know a plane caused the
23  smoke line.  Okay.  That's circumstantial
24  evidence.  Of the fact that at some point, a
25  jet plane did leave those smoke lines in the

1    sky.  And our evidence is no different.

2        The law is clear, it says that

3    regardless of the type of evidence, whether

4    it's direct, circumstantial or both; the

5    test is whether or not you are convinced

6    beyond a reasonable doubt of the Defendant's

7    guilt, before you would be authorized to

8    convict.

9        Okay.  Now tomorrow morning, you will

10   begin deliberations.  Be here before nine

11   o'clock.  I will have the verdict form

12   prepared for you.  The verdict form will

13   give you the following choices:

14       One, we, the jury, find the Defendant

15   guilty of trafficking in cocaine or not

16   guilty.

17       Two, we, the jury, find the Defendant

18   guilty of failure to affix a tax stamp; or

19   two, not guilty.

20       Three, we, the jury, find the Defendant

21   guilty of possession of drug paraphernalia;

22   or two, not guilty.

23       It will be two options for each of the

24   three charges.  You will check the one that

25   you unanimously agree upon.  Your verdict

1    must be the verdict of all 12 of you and

2    since I've already lost my alternate, please

3    don't let anything happen to you this

4    evening.

5        Don't go out this evening, just stay at

6    home and get you good night's rest, you

7    know.  And be back here before nine o'clock.

8        When you go back to deliberate tomorrow

9    you will have your brains that you've heard

10   the evidence.  You'll have your note that

11   you preserved testimony.  You will have the

12   exhibits that the court reporter will bring

13   back to you for your review.

14       Is that sealed?

15       MR. ANDERTON:  The cocaine?

16       THE COURT:  Uh-huh.

17       MR. ANDERTON:  I'm assuming it is, it

18   usually is.

19       THE COURT:  All right.  Don't y'all

20   open the cocaine, all right?

21       We don't want any problems, don't open

22   it.

23       Okay.  Do y'all have any questions

24   about anything?

25       Y'all know not to go to any of the

1    addresses that you've heard.  You know not

2    to talk to you -- Tell your girlfriends and

3    boyfriends, and husbands and stuff like that

4    after the case is over you can talk to them

5    as long as they would like to.  You just

6    can't discuss it right now, okay.  Okay.

7         Y'all have a good -- Leave your

8    notepads in the back.  Put a sign on the

9    door.  So that the cleaning people won't

10   destroy their notepads and throw them away.

11        Y'all have a good and safe evening, and

12   I'll see y'all in the morning by nine.

13        Everyone else remain seated until the

14   jury leaves out.

15           (Jury released.)

16       THE COURT:  Anything for the State?

17       MR. ANDERTON:  Nothing, Your Honor.

18       THE COURT:  Anything for the defense?

19       MR. BENSON:  No, Your Honor.

20         (Whereupon, court was adjourned.)

21           April 8th, 2009

22         (Whereupon, the following

23         proceedings resumed at 9:00 a.m.

24         on the 8th day of April, 2009 with

25         the Defendant and all counsel

```
 1                    present.)
 2                    (Whereupon, the jury begins
 3                    deliberating at 9:00 a.m.)
 4                    (Whereupon, the Court received a
 5                    communication from the jury at
 6                    9:50 a.m. where the following was
 7                    heard in open court with the
 8                    Defendant and all counsel
 9                    present.)
10              THE COURT:  All right.  Bring them in.
11                    (Whereupon, the jury returns to
12                    the courtroom.)
13              THE COURT:  Have a seat.
14              All right.  Ladies and gentlemen of the
15         jury, it is my understanding that you have
16         sent me a communication as follows:
17              "What does the law say about the
18         knowledge of the use of drugs and sell of?"
19              Is that the question?
20              A JUROR:  Yes, Your Honor.
21              THE COURT:  Can you tell me in
22         reference to which charge is this question
23         directed toward?
24              Trafficking?
25              A JUROR:  The trafficking.
```

1       THE COURT:  Okay.

2           The law says a person acts knowingly

3       with respect to conduct or to a

4       circumstance, when he is aware of -- I'm

5       sorry, when he is aware that his conduct is

6       of that nature, or that the circumstance

7       exists.

8                   (Pause.)

9           THE COURT:  A person acts knowingly

10      with respect to conduct.  That's a fancy way

11      of saying that when you do something you

12      know what you are doing.

13          Or to a circumstance.  Being in a

14      certain situation.

15          When he is aware.  When he knows what's

16      going on.

17          When he is aware that his conduct.

18      What he is doing.

19          Is of that nature.  Criminal conduct.

20          Or that the circumstance exists.  With

21      what's going on there.

22          Does that make sense?

23          A JUROR:  Yes, Your Honor.

24          THE COURT:  Does that help you?

25          A JUROR:  Yes, Your Honor.

```
 1              THE COURT:  May I help you further?
 2                   (No response.)
 3              THE COURT:  You may retire to
 4         deliberate.
 5                   (Whereupon, Court's Exhibit Number
 6                   1 was marked and received into
 7                   evidence.)
 8                   (Whereupon, the jury continues to
 9                   deliberate.)
10                   (Whereupon, at 10:08 a.m. the jury
11                   reaches a verdict.)
12                   (Whereupon, the following is heard
13                   in open court with the Defendant
14                   and all counsel present, with the
15                   jury.)
16              THE COURT:  All right.  Let the record
17         reflect that the Defendant is present, all
18         counsel are present.
19              Ladies and gentlemen, it is my
20         understanding that Mr. Josh Stewart is your
21         foreperson; is that correct?
22              FOREPERSON:  Yes, Your Honor.
23              THE COURT:  Is it my understanding that
24         you have arrived at a unanimous verdict as
25         it relates to each three counts?
```

```
1          FOREPERSON:  Yes, Your Honor.
2          THE COURT:  Would you please stand?
3               (Foreperson complies.)
4          THE COURT:  If you would, please stand
5     with counsel?
6               (They comply.)
7          THE COURT:  Would you please read the
8     verdict of the jury?
9          FOREPERSON:  We, the jury, find the
10    Defendant, Durrell Bester, guilty of
11    trafficking of cocaine.
12         Guilty of failure to affix a tax stamp,
13    and guilty of possession of drug
14    paraphernalia.
15         THE COURT:  All right.  Thank you very
16    much.  You may be seated.
17              (Foreperson complies.)
18         THE COURT:  You may be seated.
19              (They comply.)
20         THE COURT:  Ladies and gentlemen of the
21    jury, I know that both sides wish to thank
22    you for your work in this case and you all
23    have been very attentive to the evidence in
24    this case.  And you have certainty fulfilled
25    your civic responsibility.  And we really
```

1    appreciate it.

2        At this time, I'm going to ask that you

3    return to the jury room, where I will join

4    you shortly.

5            (Jury leaves.)

6        THE COURT:   All right.   Mr. Bester, the

7    jury has returned the verdict in the

8    following words and phrases, CC08-3771 and

9    72:

10       We, the jury, find this Defendant,

11   Durrell Bester, as to count one, guilty of

12   trafficking in cocaine; count two, guilty of

13   failure to affix tax stamp; CC08-3772,

14   guilty of possession of drug paraphernalia.

15       The Court concurs in the verdict of the

16   jury and I hereby find that you are guilty

17   of these three offenses.

18       Sentencing is hereby set on May 26th,

19   '09 at nine o'clock a.m.

20       Billy, I need you to do some paperwork

21   so that the probation office can come over

22   and get some information from him for the

23   pre-sentence report.

24       Thank you, sir.

25       We will be adjourned.

1               (Whereupon, the following

2               proceedings were adjourned at

3               10:11 a.m. on the 8th day of

4               April, 2009.)

5

6

7            **** END OF PROCEEDINGS ****

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COMPLETION OF

REPORTER'S TRANSCRIPT


IN RE:


DURRELL BESTER V. STATE OF ALABAMA

CC2008-3771 & CC2008-3772

* * * * * * * * * * * * * *


I, Alicia Martin, Official Reporter for the
Tenth Judicial Circuit of Alabama and Notary
Public, State of Alabama at Large, do hereby
certify there came before me the aforementioned
proceedings, including witnesses who were duly
sworn to testify to the truth concerning the
matters in this cause, said evidence being taken
down stenographically by me and transcribed by me
or under my supervision and control.

All the pages of the transcript are
numbered serially at the right-hand corner of each
page, prefaced by the reporter's index, followed
by the transcript, and ending with the numbers
appearing on this certificate.

I further certify that I am neither
attorney or counsel for, nor related to, or

1  employed by any of the parties to the action in

2  which this proceeding is taken; and furthermore,

3  that I am not a relative or employee of any

4  attorney or counsel employed by the parties hereto

5  or financially interested in the action.

6      IN WITNESS THEREOF, I have set my hand and

7  affixed my Notarial seal this the 20th day of

8  November, 2009.

9

10

11

12

13

14

15

16

17

18  _Alicia Martin_

19  Alicia Martin, Official Court Reporter

20  ACCR#218

21

22

23

24

25

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br><br>243 |
| --- | --- | --- |

TO:   The Clerk of the Court of Criminal Appeals          Fax: (334) 242-4689
      P. O. Box 301555
      Montgomery, Alabama 36130-1555

Criminal Appeals Case Number      CR 08 - 1636

Durrell Bester                    v. State of Alabama
**Appellant's Name**                  **Appellee**

On appeal from the: [✓] Circuit Court of
                    [ ] District Court of    Jefferson County
                    [ ] Juvenile Court of

Trial Court Case Number CC2008-3771,
                        CC2008-3775

Notice of Appeal Date 7/8/09

I, Alicia Martin _____, certify that I have this date completed and
filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings
in the above referenced case that were reported by me and were specifically designated by the appellant for
inclusion on the Reporter's Transcript Order.  The transcript, which is numbered serially in the upper right-hand
corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and
the testimony of the witnesses.  The original transcript concludes with the original of this notice and the copies of
the transcript conclude with copies of this notice.  The page number appearing in the upper right-hand corner of
this certificate is the last page of my portion of the transcript in this case.

Done this the 24th day of November, 2009

Alicia Martin
Court Reporter

**FILING AND SERVICE OF THIS FORM:**   Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of
this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel
for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the
district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on
the municipal prosecutor rather than the attorney general and district attorney.

1

1   STATE OF ALABAMA

2   ORIGINAL   IN THE CIRCUIT COURT

3   OF THE TENTH JUDICIAL CIRCUIT

4   FOR JEFFERSON COUNTY, ALABAMA

5   CRIMINAL DIVISION

6

7   DURRELL BESTER,

8

9    APPELLANT,

10

11  VS.                    Case Number: CC2008-3771,

12                                      CC2008-3772

13  STATE OF ALABAMA,          FILED IN OFFICE
                               CIRCUIT CRIMINAL
14
                               NOV 2 4 2009
15   APPELLEE.
                               ANNE-MARIE ADAMS
16                                 CLERK

17  - - - - - - - - - - - - - - - - - - - - - - - -

18

19       COURT REPORTER'S OFFICIAL TRANSCRIPT

20

21       The above-entitled case came on to be heard

22  before the Honorable Clyde E. Jones, Judge, on the

23  26th day of May, 2009 at or about 9:00 a.m. before

24  Alicia Martin, Official Court Reporter and

25  Commissioner.

1          A P P E A R A N C E S

2

3

4

5

6      Representing the State of Alabama:

7

8

9          Mr. Mike Anderton,

10        Deputy District Attorney

11

12

13

14

15

16      Representing Defendant Bester:

17

18          Mr. William Benson,

19          Attorney at Law

20        Birmingham, Alabama

21

22

23

24

25

3

| | | | MAR / ADM |
|---|---|---|---|

EXHIBIT INDEX

STATE'S EXHIBITS:                                   MAR / ADM

A        Prior Conviction                    6          6

B        Prior Conviction                    6          6

C        Prior Conviction                    6          6

D        Prior Conviction                    6          6

1            ŚENTENCING

2         May 26th, 2009 - 9:00 a.m.

3              (Whereupon, the following was

4              heard in open court with the

5              Defendant and all counsel

6              present.)

7         THE COURT:  All right.  This is State

8    of Alabama vs. Durrell Bester

9    CC08-3772[sic].

10        Back on April 8th, 2009 he was found

11   guilty of trafficking in cocaine, failure to

12   affix tax stamp, and possession of drug

13   paraphernalia.

14        We're for sentencing today.

15        What says the State?

16        MR. ANDERTON:  Judge, for purposes of

17   this hearing the State would move to

18   introduce four prior felony convictions.

19   Certified copies of those convictions.

20        In case number CC1999-970, State would

21   move to introduce a certified copy of a

22   conviction out of the Circuit Court of

23   Jefferson County in Bessemer, where Durrell

24   Bester, represented by Sherrie Dudley, pled

25   guilty to -- was originally charged with

1    attempted murder, pled guilty to discharging

2    a firearm into an occupied vehicle.  And was

3    sentenced to a period of ten years in the

4    penitentiary by the Honorable Mac Parsons.

5        THE COURT:  All right.

6        MR. ANDERTON:  And I have shown each

7    one of these to defense counsel.

8        In case number CC99-1278, out of the

9    Circuit Court of Jefferson County Bessemer

10   Division, Durrell Bester was represented by

11   Mr. Jeff Hood.  And in that case, in front

12   of the Honorable Teresa Petelos, Mr. Bester

13   -- I'm sorry, in front of Mac Parsons, Mr.

14   Bester pled guilty to discharging a firearm

15   into an occupied vehicle.  Originally having

16   been charged with assault first-degree.  And

17   at that time, Mr. Bester was sentenced to a

18   period of ten years incarceration.

19       CC2000-1258, Durrell Bester was

20   represented by the Honorable Jadd Fawwall,

21   and at that time pled guilty in front of the

22   Honorable Mac Parsons in the Circuit Court

23   of Jefferson County Bessemer Division to

24   possession of marijuana first-degree, and

25   was sentenced to ten years in the

1   penitentiary.

2       And finally, a certified copy of a

3   conviction in case number CC2000-1259 in the

4   Circuit Court of Jefferson County, Bessemer

5   Division where Durrell Bester was charged

6   with possession of marijuana, and in fact

7   pled to possession of marijuana first-degree

8   in front of the Honorable Mac Parsons.  And

9   at that time received a sentence of ten

10  years in the penitentiary.

11      State would move to introduce each one

12  of those.  We don't have them marked yet,

13  but I would propose, Your Honor, that we

14  mark them State's Exhibits A, B, C and D for

15  purposes of this sentencing hearing.

16      THE COURT:  All right.  They're in.

17          (Whereupon, State's Exhibits A, B,

18          C and D were marked and received

19          into evidence.)

20      MR. ANDERTON:  Judge, Mr. Bester was

21  convicted of trafficking in marijuana --

22  Excuse me, trafficking in cocaine, in this

23  particular case, along with possession of

24  drug paraphernalia, but also failing to

25  affix the tax stamps.

1      When it comes to the trafficking in

2   cocaine, Mr. Bester, based on his prior

3   felony convictions and the Alabama Habitual

4   Offender Act, would be looking at a sentence

5   of either life or life without parole in the

6   penitentiary.

7      State would ask this Court to sentence

8   Mr. Bester to a sentence of life in prison

9   without the possibility of parole. The

10   State is basing this on his prior felony

11   convictions. That is, the discharging a

12   firearm into an occupied dwelling[sic]. Two

13   counts of each of those. Two separate

14   incidents where Mr. Bester pled guilty.

15      The State proposes that these are in

16   fact violent acts. And this Court can

17   certainly find Mr. Bester to be a violent

18   offender. And the life or life without

19   parole, as this Court knows, is certainly

20   within the discretion of this Court.

21      But the State would propose that if the

22   life without parole sentence was in fact

23   made for violent offenders, and Mr. Bester

24   has in fact proven himself in the past to be

25   a violent offender. Now he has been

1    convicted of the trafficking in cocaine.

2    And we would ask for a life without parole

3    sentence.

4         THE COURT:  Anything for the defense?

5         MR. BENSON:  Yes, Your Honor.

6         The State has pointed out that he has

7    been priorly convicted of some violent

8    crimes.  This crime itself is not a violent

9    crime.  Two prior crimes were Class B, two

10   are Class C, and occurred a number of years

11   ago.  Over nine years ago.

12        Since that time, my client's been, you

13   know, a stand-up citizen.  Has two children,

14   a ten year-old little girl, and a four

15   year-old little girl, also is expecting

16   another child.

17        There's a -- prior to while we were

18   waiting for trial on this, my client was

19   attending Narcotics Anonymous.  Was

20   attending the Fatherhood Program,

21   counseling.

22        This is a man who is trying to get his

23   life turned around.  He's made some mistakes

24   --

25        THE COURT:  Did you know that he was

1    keeping drugs in his mother's home?

2        MR. BENSON:  That was the testimony at

3    trial.  The mother testified that there was

4    a, you know, another party that brought the

5    drugs into the house.

6        THE COURT:  Well, when they went to

7    arrest him, when they were executing the

8    search warrant, the mother said, in a

9    written statement, that the bedroom belonged

10   to her son, Durrell Bester.  And in the

11   middle of the bedroom floor was another bag;

12   which contained a box of plastic baggies,

13   digital scales, and a Pyrex measuring cup

14   with cocaine residue.

15       MR. BENSON:  Yes, Your Honor.

16       THE COURT:  And they also found a bag

17   hidden behind a stereo in his room.  Which

18   contained 75 grams of crack and powder

19   cocaine.  There was a gun.  A .22 caliber

20   handgun found.

21       MR. BENSON:  There was no charge

22   brought on the gun.  It was a licensed gun.

23       The mother can't be here today, she

24   just got out of the hospital a day or two

25   ago, for heart failure.  She suffers from a

1    number of health issues, including heart

2    failure and diabetes.

3         Mr. Bester is one of her main

4    caregivers.  I have a number of individuals

5    here that would like to speak on

6    Mr. Bester's behalf if you would like to --

7         THE COURT:  Raise your right hand.

8              (Whereupon, the witnesses

9              testifying on behalf of the

10             Defendant, Durrell Bester, were

11             duly sworn and testified as

12             follows.)

13        THE COURT:  All right.  State your name

14   first.

15        THE WITNESS:  Carlos Williams, I'm

16   Pastor for Greater Grace Baptist Church --

17        THE COURT:  Go ahead.

18        THE WITNESS:  Mr. Bester has been a

19   member of my church.  I've been a pastor of

20   two churches prior to this church, 46th

21   Baptist Church in East Lake.  And in my

22   presence he's always been a very respectable

23   young man, in my presence.

24        I'm not really familiar with the

25   details outside of the church and the

1    attendance that he's had on previous
2    occasions.  But he has been a very
3    respectable young man.
4         His mother and family have been members
5    of my church, under my leadership for the
6    past seven or eight years.  And have always
7    been very faithful and active attenders.
8         So I would ask you, as my experience
9    with working with Calhoun County Juvenile
10   system, that I mentor to young men on
11   several occasions.  Our church also serves,
12   and has been for the last three or four
13   years, serving as a site for community
14   service.
15        So what I would ask you, Judge Jones,
16   if you would give me an opportunity to try
17   to make an impact of this young man's life.
18   And I think that he has the tools and the
19   makings of being productive, but I think
20   that he does need the presence of another
21   young black male, especially as a
22   preacher/pastor.  To give me that
23   opportunity to make a difference in his
24   life, sir.
25        THE COURT:  All right.  And you are?

```
 1           THE WITNESS:  My name is Deborah
 2      Thomas.  I'm an active member of Narcotics
 3      Anonymous.  Mr. Bester has been a member for
 4      about a year now.  Up until the time he was
 5      incarcerated.  He's a real respectable young
 6      man.  He's real likeable, and real
 7      interested in Narcotics Anonymous.
 8           And has played a part in many of our
 9      functions that we have had.
10           And he's a real outstanding young man.
11           THE COURT:  Okay.  And you are?
12           THE WITNESS:  My name is Jena Chambers.
13      And I've known Mr. Bester for about five and
14      a half, six years.
15           During the time that I was going
16      through some issue with my family, he's been
17      there for me.  Somebody I can talk to and
18      somebody that I can count on.  He's very
19      family oriented.
20           Like I said, I had moved out of my
21      mother's house, and he made sure that I had
22      a way to and from work.  And I told him
23      numerous times that without him, I don't
24      know where I would be.  Because I wouldn't
25      have made it if I couldn't go to work.
```

1          THE COURT:  All right.  Anybody else?

2          Yes, ma'am, and you are?

3          THE WITNESS:  I am Wakesha Coleman, I

4     am Mr. Bester's fiance, and I'm also

5     expecting a child, that he's about to bring

6     into this world.  I ask that -- He is great

7     father.  And he deserves to be -- Well, his

8     kids deserve to have him in their lives.

9     And especially with a child that's unborn to

10    never know a father is a bad thing.  And his

11    child deserves to know his father.

12          And his daughters deserve to have their

13    father in their life.  He deserves to be

14    here and be willing to take care of these

15    kids that he's left us with.

16          And I just ask you to give us a chance

17    to have a family.

18          THE COURT:  Did you know he was using

19    marijuana as recently as February of this

20    year?

21          THE WITNESS:  Did I know?

22          THE COURT:  Yeah.

23          THE WITNESS:  He's been clean.

24          THE COURT:  Okay.  Anything else?

25          MR. BENSON:  Judge, a couple other

1    people came that want to say something.  You

2    need to swear them in?

3              (Whereupon, the following

4              witnesses were duly sworn by the

5              Court and testified as follows.)

6        THE COURT:  What's your name?

7        THE WITNESS:  Latasha Conwell.

8        THE COURT:  Go ahead.

9        THE WITNESS:  This is my brother, Your

10   Honor.  And I don't think that he deserves

11   this.  You know, we all do wrong.  But he

12   haven't killed anyone.  And I think my

13   brother deserves a second chance.

14        He's a good person.

15       THE COURT:  You understand he has four

16   prior felonies, two of them include shooting

17   into a building[sic], an occupied

18   building[sic]?  Did you know that, that he

19   had four prior felony convictions?

20       THE WITNESS:  That was nine years ago.

21   He was really young, you know?

22       THE COURT:  Well, this happened last

23   year, March 24th of '08.  Just last year.

24       THE WITNESS:  What happened last year?

25       THE COURT:  This trafficking incident.

```
 1              THE WITNESS:  I know.  We had to feed
 2       the family.  You have to do, what you have
 3       to do sometimes.
 4              THE COURT:  So he was using the
 5       proceeds to feed the family?
 6              THE WITNESS:  No.
 7              THE COURT:  Well, what are you saying?
 8              THE WITNESS:  I just think that this
 9       case wasn't tried the right way.
10              THE COURT:  Okay.
11              Anything else?
12              THE WITNESS:  Yes.
13              THE COURT:  What's your name?
14              THE WITNESS:  My name is Lashana Gater.
15       I am the mother of one of Durrell's
16       children.  I'm not here to excuse what he
17       did.  But I am here because I think he
18       missed out on a big part of my daughter's
19       life the first time.  And they came back,
20       they got this bond.  And I don't want to
21       tear a hole in her heart of him leaving,
22       again.
23              He left the first time my child was
24       one, when he came back, she was five.
25              THE COURT:  Well, who do you think is
```